Petition of the **UNITED STATES** of America, as owner of the United States **COAST GUARD VESSEL CG–95321, for** exoneration from or limitation of liability.

**IN ADMIRALTY**

No. 63–27–C.

United States District Court
D. Massachusetts.

June 30, 1966.

William E. Gwatkin, III, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for Government.

John O. Parker, Ely, Bartlett, Brown & Proctor, George J. Dodd, Morris D. Katz, Katz & Kaplan, Robert J. Hallisey, Bingham, Dana & Gould, Harry Kisloff, William B. Sleigh, Jr., Blair L. Perry, Hale & Dorr, Boston, Mass., Jack London, New Bedford, Mass., Elmer Johnson,

Joseph W. Lobdell, Boston, Mass., for claimants.

## OPINION

CAFFREY, District Judge.

These proceedings were commenced by the United States as owner of Coast Guard Vessel CG-95321 under the Limitation of Liability Act, 46 U.S.C.A. §§ 183–188, for exoneration from or limitation of liability arising out of the sinking of the Fishing Vessel BARBARA AND GAIL, which went down on December 19, 1961 with the loss of the lives of five of her crew when the CG-95321 towed her onto the rocks of Nantucket Shoals. Claims against the United States have been brought by the Sandra & Dennis Fishing Corporation as owner of the F/V BARBARA AND GAIL by the personal representatives of the five members of her crew whose lives were lost, and by the surviving members of her crew for personal injuries and loss of personal effects. After trial I find and rule as follows:

At all times material to this action the United States was the owner and operator of CG-95321, a patrol boat of 90 gross tons, 95 feet in length, 18 feet in breadth, with a normal draft of 4 feet forward and 6 feet aft. She was powered by four 600 horsepower diesel engines on two shafts with a maximum speed of 21½ knots and a minimum speed of 7 knots. The home port of the CG-95321 was New Castle, New Hampshire, but at the time of the incident hereinafter described she was assigned to a search and rescue patrol on which she operated out of Woods Hole, Massachusetts.

The BARBARA AND GAIL was a wooden-hulled fishing vessel 90 feet in length, 19 feet in breadth, with a maximum draft of 10 feet. She was owned by the Sandra & Dennis Fishing Corporation, whose president and treasurer was Captain Sheldon S. Kent, and who was also the master of the vessel.

On December 16, 1961, the BARBARA AND GAIL left New Bedford, Massachusetts, with a crew of 10 men aboard,

including Captain Kent, on a commercial fishing voyage to Georges Bank. She was equipped with radar, a fathometer, two loran receivers, a magnetic compass and a radio telephone, all of which were in good operating condition. On the morning of December 18, at about 6:15, Captain Kent discovered that the BARBARA AND GAIL had lost her rudder.

At about 7:50 a. m., on December 18, the Coast Guard Rescue Coordination Center (RCC) at Boston received a call through the Boston marine operator from the BARBARA AND GAIL requesting Coast Guard assistance. The RCC Controller on duty was LTJG Edward J. Crane, who talked with the BARBARA AND GAIL and was advised that she was disabled with a lost rudder but in no immediate danger and that she requested a tow to New Bedford. The message gave her communications facilities and identifying characteristics, and gave her position in loran coordinates and as 52 miles southeast of the Great Round Shoals buoy. This buoy marks the seaward entrance of a channel between the Atlantic Ocean and Nantucket Sound through the shoals between the eastern side of Nantucket Island and the southeast tip of Cape Cod. The message gave no weather information, but the weather on the scene at the time was fine, with no wind to speak of and just a little chop to the sea.

The search and rescue (SAR) functions of the Coast Guard are coordinated in the New England area by the Rescue Coordination Center (RCC) of the First Coast Guard District, whose geographic area encompasses the Atlantic Ocean from Montauk Point, at the tip of Long Island, out roughly 1500 miles beyond Cape Cod, into the Labrador Sea. In the coastal waters off Massachusetts the First Coast Guard District kept two vessels at all times standing by on patrol for SAR missions. One of these patrols was the Provincetown patrol, whose patrol area was generally between Cape Ann and Chatham, on Cape Cod. The other was the Vineyard Sound patrol, whose patrol area was generally from Chatham on around past Buzzards Bay. The Vineyard Sound patrol vessel, when not on a mission, was permitted to moor at Woods Hole, Massachusetts.

Both patrol vessels are on so-called "Alfa" status, which means either underway or ready to get underway in 15 minutes. The two patrol vessels are referred to as the major Alfa and the minor Alfa, the major vessel being a larger vessel such as a seagoing tug or ocean station vessel ordinarily assigned to Provincetown with access to the open ocean, and the minor patrol vessel being a 95, 110 or 125 foot patrol boat assigned to Vineyard Sound. Other Coast Guard vessels are in so-called "Bravo" status, ready to get underway within a specified maximum number of hours. On December 18, 1961 the Alfa vessel on the Vineyard Sound patrol was the CG-95321, a 95 foot patrol boat.

On receipt of the message from the BARBARA AND GAIL, Crane checked his weather reports and the status board giving the position of all available search and rescue vessels. The weather reports for coastal waters off New England were normal, predicting winds of from 10 to 15 knots, with seas of from 2 to 4 feet. His status board disclosed that of the two SAR patrol vessels, the Provincetown vessel was committed to another mission from which it was not to be diverted if there were other SAR vessels equally available and that the closest and most immediately available other Alfa vessel was the CG-95321, which was on the Vineyard Sound patrol. He accordingly dispatched the CG-95321 to assist the BARBARA AND GAIL, by message which was sent from RCC at 8:00 a. m.

Under his routine instructions the RCC Controller could not dispatch a 95 foot patrol boat more than 50 miles offshore without the approval of his superiors. The responsible superior was Commander John M. Waters, who was then the Chief of the Search and Rescue Branch for the First Coast Guard District. He arrived at his office shortly after Crane had dispatched the CG-95321 and upon being advised by Crane of his action immediate-

ly approved it. Under the conditions then existing and predicted, the dispatch of a properly manned and equipped 95 foot patrol boat would not have been unreasonable.

The CG-95321 was manned by a crew of one officer and 14 enlisted men. Her commanding officer was LTJG Garald H. McManus, who was then 24 years old, a 1959 graduate of the United States Coast Guard Academy. After graduation he was assigned to the Coast Guard cutter BARATARIA, where he had, among other duties, served as operations officer and navigator and an underway officer of the deck. He took command of the CG-95321 in February of 1961. At the time of the trial he held the rank of Lieutenant and was assigned to duty as a navigation instructor at the Reserve Training Center at Yorktown, Virginia, where he taught beginners. He was relieved of command of the CG-95321 on January 9, 1962, 21 days after the disaster. He was then sent to school in Groton, Connecticut to "study up on loran" and then ordered to serve one year at a loran station on St. Paul's Island in Alaska.

The CG-95321 was equipped with a gyro compass, magnetic compass, radar, loran, fathometer, radio direction finder (RDF), and various radio equipment. Her RDF had become inoperative on December 16, 1961 and not only had not been repaired prior to the disaster but had not even been reported inoperative by McManus. Her fathometer had been troublesome for some time, at one point being described in the log as "lousy," and it was useless at speeds of 10 knots or better, or in rough seas. Because of prior dissatisfaction with attempts to use the fathometer it was not even turned on during this mission until after the grounding of the BARBARA AND GAIL. The CG-95321 had lead lines for sounding depths on board but they were not used at any time during the mission.

From all that appears in the record, the magnetic compass was accurate, but it was not used. Instead, the CG-95321 was steered exclusively by the gyro compass which had been installed in September or October for evaluation. This gyro compass was inaccurate, having a consistent westerly error, usually 3 degrees off, from a true heading.* Her loran had been inaccurate and unreliable almost since the day it was installed. On March 27, 1961, just a week after it was installed, the loran was inoperative. It was again or, perhaps, still inoperative on March 30. On April 12, 1961, just six days after being returned to the boat after repairs, the loran was once again inoperative. On June 25 the log entry reports that the loran was not normal. On June 27 the log entry is "set not operating properly." The same entry appears on August 4. On August 13 the loran was inoperative. It was still inoperative on August 23. On August 24 the set was worked on with negative results. On October 17 the log reports "operation fair and under evaluation." The last entry in the log for 1961 was made on November 12, about a month

*The compass comparison log, also called the compass check log, which was used to record for comparison readings taken from the gyro compass and the magnetic compass, was not produced at trial. In lieu thereof, photostatic copies of certain pages from this log were admitted in evidence as Roberts' Exhibit 15. Counsel for the Government stipulated in open court that at all material times the Coast Guard has had custody of this book and that save for the time that it was before the Marine Board of Inquiry it was aboard the CG-95321. An examination of Exhibit 15 shows that the pages of this comparison log covering the critical 77-day period from November 13, 1961, some 35 days prior to the accident, to January 30, 1962, some 42 days after the accident, were torn out of this book prior to its production as evidence at the trial. The purpose of the book, of course, is to reflect the accuracy or inaccuracy of the compass and the destruction of this evidence while the book was in the custody of the Coast Guard, and presumably in the custody of the crew of the CG-95321, gives rise to the inference, which I draw, that the information contained in the destroyed pages was adverse to the position of the Coast Guard in this case.

before the disaster. It reads "No third function—inaccurate." No repairs were made thereafter prior to December 19. The radar aboard the CG-95321 was apparently operating normally.

The CG-95321 received her orders at 8:10 a. m. on December 18 and was underway at 8:20. She proceeded at 550 rpm out of Nantucket Sound by way of the Great Round Shoals Channel, passing the seaward fairway buoy at 11:24 a. m. As she passed the buoy and came to course 119 degrees true to head for the BARBARA AND GAIL, she reduced speed, first down to 410 rpm at 11:40 a. m., then twice more until at 3:00 p. m. she was down to 320 rpm, or 10 knots. The speed was reduced because of worsening weather. The first of a number of unexplained alterations in the ship's logs and the suspicious disappearance of records appears at this point. The log of the CG-95321 (Govt. Ex. 52) contains a notation of the course at 1300. This notation is obviously 122° marked over to read 115°. On the right hand page, which contains a running commentary on the events aboard ship, there appears a change of course notation at 1300 that is also 122° marked over to read 115°. No explanation for this change was given; indeed, although all crew members who stood pilot house watches testified, the person who made the change was never identified. It was claimed at trial that loran fixes were taken on the way out to the BARBARA AND GAIL but no positions were logged or marked on the chart.

The CG-95321 located the BARBARA AND GAIL without difficulty, picking her up first by radar at a range of four to five miles, and arriving at her position at 3:45 p. m. By 4:00 p. m., the CG-95321 had her in tow, at a position 46 miles from Great Round Shoals buoy, the BARBARA AND GAIL having drifted to the west and south during the day. After making up the tow, the CG-95321 set a course of 304° true, rung up a towing speed of 12 knots, and headed for the Great Round Shoals Channel entrance buoy. This course made no allowance for current or drift; it was simply a straight line from the CG-95321's 1600 position to Great Round Shoals buoy. For that matter, it should be noted, the 119° true course set by the CG-95321 on the way out to the BARBARA AND GAIL made no allowance for current or for any drift on the part of the BARBARA AND GAIL while she awaited the arrival of the CG-95321.

The CG-95321 used as the towing hawser a 900 foot length of 4-inch nylon rope which was relatively new, having been aboard ship for about a month. It was paid out to a length of about 700 feet and prior to the commencement of this trip it had been wrapped in a canvas chafing gear some 3 to 4 feet in length. The aft portion of this chafing gear was slightly forward of the taffrail when the tow commenced at about 1600. The towing hawser was placed in position aboard the CG-95321 by seamen Jenkins and Garcelon at a time when she was taking some water over the fantail. Jenkins said he checked the hawser and chafing gear after fastening it and then went below and turned in. He likewise testified that he watched the hawser between 1730 and 1800 from the rear window of the pilot house and that it was riding normally with the chafing gear in position on the taffrail. It is noteworthy that he was then serving as O.D. and had a number of other duties to perform.

Garcelon testified that he too went below after connecting the hawser and returned to deck when it parted. Seaman Nofs who appears not to have been on duty at 1600 nevertheless testified that he observed the hawser from the pilot house for about an hour, then went to the ship's office, and then went below, returning to deck when the tow parted. McManus testified to fleeting checks of the condition of the hawser. It parted just aft of the chafing gear at 6:00 p. m.

Having in mind the testimony that the fantail was constantly taking water at this time, I find, first, that no one did, or testified that he did, go back to make a close and proper examination of the towing hawser and chafing gear at the

taffrail. Secondly, having in mind the fact that the Court went aboard the CG-95321 at her base in New Castle, New Hampshire, in connection with certain pretrial discovery which took place thereon, and carefully examined the view from each of the pilot house windows, and having in mind the obstructions to the visibility of anyone seeking to look aft from the rear windows of the pilot house (see Roberts' Exhibits 7, 8), and the fact that it became dark at or shortly after 1630 on December 18, I am persuaded that no meaningful surveillance or inspection of the condition of the towing hawser or the position of the chafing gear was made at any time subsequent to the commencement of the tow at 1600. I find that the towing line parted because of the improper placement of the chafing gear on the towing line, compounded by the failure to maintain a proper surveillance of its condition during the tow, with the result that it was weakened by friction on the taffrail.

In so finding I have in mind that the chafing gear was successfully applied in a different way during the second tow, and that during the second tow various members of the crew went aft to check the chafing gear and the towline at close range. On at least one occasion Garcelon had to readjust the chafing gear which had slipped so that it was no longer protecting the rope from chafing against the rail. I rule that the Captain and crew of the CG-95321 were negligent in not making a proper inspection of the towing hawser at any time prior to its parting. In ruling that negligence caused the line to part, I decline to give weight to Govt. Exhibit 69, a copy of the report of L. J. Sheehan, a deceased employee of the Boston Naval Shipyard, in which an opinion is expressed as to the cause of the rupture of the towline. In declining to give weight to this report I have in mind that there is nothing before me to indicate what factors Mr. Sheehan took into account or what information was supplied to him or what assumptions he made, and that his statement is both unsworn and not subject to the probing

effects of cross-examination by the other parties to the litigation.

There was conflicting evidence at the trial concerning weather conditions during this mission, especially as to conditions about the time the tow parted. All of the witnesses agreed that the weather worsened after the tow began at 1600 and that it slackened off about 10:00 p. m. Various members of the crew of the CG-95321 testified at the trial that the wind reached speeds of "40–45 knots" (McManus), "40 knots" (Nofs), "35–40 knots" (Jenkins), and "25–30 knots" (Judkins). The height of the seas was estimated as 15–18 feet (McManus), 12–15 feet (Nofs), 10–12 feet (Judkins), and 6–8 feet (Jenkins).

In contrast to these versions of the weather conditions related at the trial, the hourly entries contemporaneously made in the ship's log by the crew-members of the CG-95321 report that from 1400 on December 18 until 0300 December 19, the wind was logged as Force 6 on the Beaufort Scale, i. e., a wind of 22 to 27 knots. The log indicates that a Beaufort 6 wind is characterized as strong in United States Weather Bureau forecasts. For the same time period, sea conditions were logged as "4," i. e., a moderate swell. This is characterized in the log as a moderate sea. At 1821 on December 18, the Pollock Rip Lightship reported winds of 28 knots, with a sea of 10 feet. The United States Weather Bureau posted small craft warnings at 1800 for the area Block Island to Portland, Maine, and predicted northeast winds from 20 to 30 knots in the south portion. Finally, Captain Kent's description of the weather conditions corresponds to the log entries of the CG-95321.

I accept the entries in the log of the CG-95321 as correctly reflecting existing weather conditions and I disbelieve the contrary testimony of the crew-members because I find that at the trial they intentionally exaggerated the weather conditions.

After drifting around for 2½ hours in a vain attempt to reestablish the tow,

McManus sent a radio message, at about 2035, to the First Coast Guard District headquarters, advising headquarters for the first time that he had lost the tow some 2½ hours earlier and requesting that he be relieved by a larger vessel. Although there appears on the ship's chart what purports to be a loran fix of his position obtained by McManus at 2005, the message he sent to headquarters requesting relief at this time did not contain a report of his position. Upon receipt of this message the duty officer conferred with Commander Waters about sending out the Coast Guard cutter FREDERICK LEE which was in New Bedford on Bravo 6 status, ready to get underway within a maximum of six hours, and at 9:42 p. m. the FREDERICK LEE was ordered out.

After sending his message, McManus informed Captain Kent that he had requested relief by a larger vessel and that he intended just to stand by until the larger vessel came out. In response Kent requested that the CG-95321 try to reconnect the tow because, as he put it, "I was afraid we might be drifting down onto Nantucket Shoals." The CG-95321 made another attempt to connect the towline and succeeded. The towing hawser was reconnected at 9:05 p. m., just as Commander Waters was dictating a message, which was never sent, instructing McManus not to take the BARBARA AND GAIL back in tow. At 9:20 p. m., the CG-95321 sent a message to the First Coast Guard District which was received in Boston RCC at 9:36 p. m., about the time the FREDERICK LEE was being dispatched, advising that she had the fishing vessel back in tow. This message reported the position of the CG-95321 at 2105, a position that does not appear on the ship's chart. This reported 2105 position, which was charted on Govt. Ex. 57, is extremely close to the 2005 position, which was transposed from the ship's chart. When asked at the trial about the proximity of these positions, McManus said it was "very possible" that the loran position reported to the First Coast Guard District was "predicated upon (his) 2005 reading." In short, he either guessed at his 2105 position or reported the position he had obtained at 2005, which was either mischarted on the ship's chart or misread when taken off the chart for broadcast.

After the CG-95321 had the BARBARA AND GAIL back in tow, Kent asked that he be towed to windward, into the sea, so as not to further weaken her stem. The CG-95321 complied with his request and came to a northeasterly course at a towing speed of from 5 to 6 knots, with the towing hawser now at 600 feet. After they had been on this course for a while, McManus attempted a more northerly course, the BARBARA AND GAIL began to yaw, and at Kent's request the CG-95321 came back to the windward more. At 10:37 p. m., the CG-95321 changed course to due north. By 11:00 p. m. the weather had subsided enough for the BARBARA AND GAIL to be towed toward land. The CG-95321 came left to a course of 300 degrees true and came to a towing speed of 10 knots, heading, she thought, for the Great Round Shoals channel and New Bedford.

Before making his course change at 2300, McManus had obtained a loran position at 10:50 p. m., which he testified he considered at that time to be reliable. I find that the loran position McManus had obtained just before he turned toward shore was inaccurate and that he was in fact further south than that position indicated. In so finding I have in mind that the loran had been inaccurate and unreliable in the past, as reflected in the log entries, that the 1700 loran position which McManus had obtained placed him so far off his course that he himself considered it unreliable and disregarded it, that it failed completely one hour later, and, finally, that it is practically impossible that the CG-95321 could have begun at its 2300 position and steered a course of 300 degrees, yet run right onto the shoals in the position that she did.

At the point where he thought he was when he made his course change, the bearing of the Great Round Shoals chan-

nel entrance buoy was 292 degrees true and its distance about 18.5 miles. He set a course of 300 degrees in order to make allowance for current conditions. In determining what allowance should be made he did not consult his ship's chart, which reported current conditions, but instead relied on his limited general knowledge as to what the current was supposed to be in this area.

McManus knew that the FREDERICK LEE had been ordered out to relieve him, but after he came left to his supposed course for Great Round Shoals channel, he sent a message to Boston RCC reporting that Capt. Kent had advised him that the BARBARA AND GAIL could withstand the tow. McManus concluded this message by advising that no relief was required. The message was received at Boston RCC at about 11:24 p. m., whereupon RCC Controller Slade, after conferring with Commander Waters, who regrettably concurred on the grounds that those on the scene were the best judges of their conditions and capabilities, canceled the FREDERICK LEE'S sailing orders.

At about 11:45 p. m McManus attempted to get a loran reading but the third function went out and he could not obtain a fix. This was the same trouble that had been recorded in the last entry in the loran log. Even though he knew that the BARBARA AND GAIL had loran receivers, and despite the fact that he was steaming at 10 knots toward some of the most treacherous coastline in the United States, McManus, in an incredibly irresponsible act, shut down the loran without checking with the BARBARA AND GAIL from which he could have obtained a fix simply for the asking.

After shutting down his loran McManus ordered Jenkins to relieve him and he turned in. Before turning over the watch he advised Jenkins of their course and speed, the condition of the BARBARA AND GAIL, showed him what he erroneously thought was their approximate position on the chart, about 8 or 9 miles from the buoy, and advised him that the loran was out. He confidently told Jenkins that he should have no land within 15 miles, that they should be close to the Great Round Shoals buoy at 1:00 a. m., that he should sight it on his port hand, to call him when the buoy was sighted, and to call him at 1:00 a.m. in any event.

During the next hour things on the CG-95321 were outwardly uneventful as she towed the BARBARA AND GAIL toward Nantucket Shoals. Seaman Garcelon was at the helm steering a course of 300° by the inaccurate gyro compass which was relentlessly pulling the CG-95321 to the south of its intended course. The ship was yawing about 3 or 4 degrees to either side of course. Toward 1:00 a. m., Jenkins went aft to check the towing hawser, and on his return to the pilot house he saw a light to port.

The determination of the critically important question of what was done to determine the identity of this light by those on the CG-95321 in the next few minutes depends entirely on the credibility of three crew-members who were in the pilot house and who testified at trial, McManus, Jenkins the O.D., and Garcelon the helmsman. I disbelieve McManus, whose entire testimony was completely tainted by his interest in the outcome of these proceedings and was contradicted by other evidence in many instances, whose testimony on this particular point was not corroborated by either of his shipmates who were on the bridge with him, and whose testimony as to the steps he took to identify this light is completely at odds with the careless way he had conducted himself throughout the mission. I believe the testimony of Garcelon, a truthful witness, who was the only member of the crew of the CG-95321 that testified at the trial who is no longer in the Coast Guard.

I find that when Jenkins saw the light from the port bridge he called to Garcelon, who glanced at the radar screen, saw something, and responded, "Yes, you have a target here on radar." Jenkins went into the pilot house, looked at the radar and saw a pip which he interpreted as a buoy and which appeared to be on the

same general bearing as the light. Without checking the chart or the light list to determine the characteristics of the Great Round Shoals buoy light, Jenkins then called McManus and reported that he had sighted the buoy. He ordered Garcelon to come left on the light but countermanded the order almost immediately when he noticed that the BARBARA AND GAIL was hung out to starboard and was not coming around with the CG-95321.

McManus arrived in the pilot house about two or three minutes after he had been awakened. He spoke with Jenkins, who informed him of the light and the target on the radar, and looked through the windows of the pilot house at the light. Even though McManus by his own admission had been through Great Round Shoals channel at night only a couple of times, his entire conversation with Jenkins and his observation of the light took between 30 seconds and one minute. He did not consult his chart to determine the characteristics of the Great Round Shoals buoy light. He did not consult the light list which is specifically designed as an aid in the identification of navigational lights, and which gives detailed information about the characteristics of lights that is not available on charts. He did not time the light with a stopwatch, an accepted method of identifying lights which is usually conclusive when doubt exists. He did not check his radar. He did not determine his position by any means, even though he had taken only one position fix in the last five hours. He did not ask the BARBARA AND GAIL to use her loran to determine their position. He did not inform the BARBARA AND GAIL that a light had been sighted, thereby forfeiting the benefits of Captain Kent's 33 years experience in these waters. He did not turn on his fathometer. He did not order the use of lead lines. He did not post a lookout with no other duties that would interfere with his duties as lookout. Instead, sending Garcelon below for fruit juice, McManus took the helm, turned straight toward the light, and with the BARBARA AND GAIL in tow steamed at 10 knots right onto Nantucket Shoals.

McManus, of course, thought he was heading for Great Round Shoals buoy, a Lighter Whistle Buoy, whose characteristics are a short-long flashing white light. This sort of characteristic has only one meaning, for it is found exclusively on a mid-channel or fairway buoy and on nothing else. The characteristics are a short flash of 0.4 seconds, a dark period of 0.4 seconds, and a long flash of 1.6 seconds, signaling the letter A in Morse Code. The characteristic short-long flash was repeated eight times per minute. Its 400 candlepower light was 16 feet above the water and in good visibility could be seen for a distance of nine miles. The principal navigational light in the vicinity is Sankaty Head Light on the east end of Nantucket Island. This is a major lighthouse whose light is 1,100,000 candlepower, 166 feet above the water, and 70 feet above the ground. In good visibility it can be seen for a distance of 19 miles. Its characteristic is a one-second white flash every 15 seconds. During certain atmospheric conditions, mostly when there is an easterly storm and there is a mist or dampness in the air, Sankaty Head sometimes seems to have a refraction which looks as if it is flashing twice. The flashing, however, is much bigger and brighter than the one at Great Round Shoals buoy. Furthermore, the flashes seem to be practically the same length rather than short-long and are not repeated as many times per minute as those of the Great Round Shoals buoy.

I find that the light observed by those on the CG-95321 was Sankaty Head Lighthouse, not Great Round Shoals buoy. I find that the characteristics displayed by Sankaty Head that evening were substantially different from the characteristics of the Great Round Shoals buoy and that the light could have been properly identified as Sankaty Head if those aboard the CG-95321 had used proper seamanship. Specifically, I find that McManus and Jenkins were

negligent in failing to properly identify the Sankaty Head Lighthouse. Since they were expecting to see the light of the Great Round Shoals buoy at about the time they sighted this light, they failed to observe the light for a sufficiently long period to enable them to accurately determine its characteristics and check its identity, and blithely assuming it was the light on the buoy they simply turned toward it without taking the most rudimentary precautions required by good seamanship for identifying navigational lights. Their observation of the light consisted of little more than fleeting glances to determine that it was indeed a flashing light. They did not time the light with a stopwatch. The Government took the position at trial that a short-long flashing light was meant to be identified by its characteristics and that timing of the light was not important to identification. The inconsistency of this position of the Government appears from the fact that McManus himself testified on deposition that the light was finally identified as Sankaty Head AFTER the BARBARA AND GAIL had gone aground by "timing the light with a stopwatch."

Moreover, an excerpt from the transcript of a portion of Capt. Kent's testimony at the Coast Guard hearing (Govt. Ex. 79) contains questions by Lt. Commander Bruce regarding the characteristics of the Sankaty Head light. When Capt. Kent informed Commander Bruce that Sankaty Head light sometimes has a refraction which makes it look as though it is flashing twice, the Lieutenant Commander asked Kent, "Have you had occasion to check the timing of the characteristics or just similarity in appearance as you describe it?"

Dutton's "Navigation and Piloting," a recognized authority on proper seamanship, which McManus had used in school and aboard the BARATARIA and a copy of which was in the pilot house of the CG–95321, makes it clear that timing of lights is an important step to be taken in order to identify a light. I find that Sankaty Head light could have been

properly identified if McManus or anyone acting under his command had timed it with a stopwatch.

During the time the BARBARA AND GAIL was under tow her engine was shut down, her wheel secured by a becket, and she was in effect under the navigational control of the CG–95321. While there is some conflict in the testimony as to the instructions given by Capt. Kent to Clarence Roberts who was standing watch when the grounding occurred, I find that Roberts understood his instructions to be to call Capt. Kent if he saw the fathometer reading go below 10 fathoms or if he observed anything unusual. Roberts was an ordinary fisherman, not shown to be qualified or experienced in navigation, and I find that during the period he was standing watch he in fact observed nothing unusual, save a slackening of the towline. He roused Capt. Kent when the slack towline was discovered but by the time Kent got on deck the line had become taut again and Kent returned to his quarters. I find that Capt. Kent did not see the light toward which the CG–95321 had turned shortly before the line went slack. Although Roberts did see the light at some time prior to the grounding, being untrained in navigation he did not understand its significance and did not consider seeing a light unusual. I find no negligence in the fact that he did not report sighting the light to Capt. Kent, since Roberts reasonably was under the misguided impression that the crew of the CG–95321 were navigating a proper course to New Bedford.

After making its turn the CG–95321 steamed toward the light for 10 or 15 minutes. Garcelon returned to the pilot house with the fruit juice, cups, and ice cubes, followed by Bryant, the engineer, who came up just to get some juice. While standing on the port wing putting some ice cubes into his cup, Bryant saw breakers off the port bow. He poked his head into the pilot house and said, "What is this white water out here?" McManus responded, "That is what I would like to know." McManus tried to

turn to port but could not bring the ship around and the CG–95321 was swept over the shoals without grounding. The BARBARA AND GAIL, however, was towed onto the shoals and ran aground. The CG–95321 cut the towline and maneuvered as close to the BARBARA AND GAIL as she could safely go, a distance at the closest of about 150 feet. Kent informed McManus that the BARBARA AND GAIL was hard aground and taking water fore and aft. Kent also said that he was preparing a keg and line so that if it became necessary to leave the ship his men would all be together on the line.

While these arrangements were being made aboard the BARBARA AND GAIL, the CG–95321 was frantically trying to find out where she was. Her first report of the grounding, apparently a radio-telephone message sent minutes after the grounding, reported the fishing vessel aground on Great Round Shoals. This message was forwarded to the RCC but for some unexplained reason no action was taken by RCC. About 35 minutes later, McManus sent a message reporting the fishing vessel aground at Pollock Rip (pt. J on Govt. Ex. 57), a position about five miles away from the area where the sinking actually occurred. This message got some action from RCC which immediately dispatched a message requesting information as to the condition of the fishing vessel and the assistance needed by the CG–95321. McManus answered with a message received by RCC at 2:39 informing them that the fishing vessel had sunk at 2:01 a.m., that the CG–95321 was picking up survivors, and that no assistance was needed at present.

Charts were offered in evidence on which were plotted several different positions calculated by the Coast Guard to be the place at which the BARBARA AND GAIL grounded. These positions appear on Govt. Ex. 64 as positions I, J and L. I find that the site of the grounding and sinking of the BARBARA AND GAIL was on Rose and Crown Shoals in the general vicinity of and somewhere in between positions I and L, probably nearer to position I than to position L, and that the exact site of the grounding to this day has not been accurately ascertained. In any event, the sinking was in the order of 6 to 7 miles south of the Great Round Shoals buoy, the location at which McManus erroneously believed the CG–95321 to be. It should be noted that position J, the first point which the crew of the CG–95321 calculated to be the scene of the disaster, is 10½ miles south of the Great Round Shoals buoy.

Just before the BARBARA AND GAIL sank, the crew, wearing life jackets, was assembled on the forward deck, where the keg and line had been prepared, and had been informed by Capt. Kent of the procedure to be followed when abandoning the ship. Capt. Kent returned to the pilot house for a pair of swim fins because he thought they would give him greater mobility and control of the direction of the line and keg with his men on it when they were in the water. As he was returning from the pilot house he stopped to put on the fins and as he did so, "the boat went out from under me." The BARBARA AND GAIL suddenly slid off the shoal and sank within seconds at 2:01 a.m. on December 19, 1961. As a result none of her crew was able to get on the line which had been prepared. The CG–95321 picked up, before 3:00 a.m., the five crew members of the BARBARA AND GAIL who survived this disaster. Clarence Roberts was rescued through the personal heroism of Jenkins who dove into the frigid December water without a life jacket and pulled him out. Some time shortly after 4:00 a.m. a Coast Guard plane arrived on the scene and dropped flares to illuminate the area, something that had not been done by the CG–95321 although she had flares aboard. The CG–95321 recovered three bodies later in the morning. Two bodies were never recovered. The CG–95321 returned to port with the five survivors and three bodies later that day.

748

The Government urges several theories seeking to escape liability for this tragedy. It first argues that it is immune from suits arising out of rescue operations of the Coast Guard because there is no relationship in the realm of private vessels comparable with that existing between a vessel in distress and a Coast Guard vessel which gratuitously comes to her rescue, citing P. Dougherty Co. v. United States, 207 F.2d 626 (3d Cir. 1953).

■ Under the Public Vessels Act, which by reference incorporates the Suits in Admiralty Act, 46 U.S.C.A. 741–752, the United States relinquished its sovereign immunity and consented to be sued according to the principles of law obtaining in like cases between private parties for damage caused by a public vessel of the United States. Canadian Aviator, Ltd. v. United States, 324 U. S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945). Whatever persuasive effect the Dougherty decision had in the face of the forceful and well-reasoned dissenting opinion of Chief Judge Biggs has been completely eliminated by the rationale of subsequent decisions of the Supreme Court interpreting the Federal Tort Claims Act, particularly those in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), which make it abundantly clear that the United States is now liable for its negligent torts in areas where it once could avail itself of the shield of sovereign immunity to avoid answering for its wrongdoing. See also Eastern Transportation Co. v. United States, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472 (1927), cited in Fn. 2 of *Indian Towing*. It is significant for purposes of the instant case that in the course of his analysis of the Government's liability in the *Indian Towing Co.* case, Mr. Justice Frankfurter noted (350 U.S. at p. 67, 76 S.Ct. 122) and reaffirmed the fact that the Government had tried but failed to escape liability under the Suits in Admiralty Act for negligent performance of a so-called "purely governmental function" in the *Eastern Transportation* case decided back in 1927.

The Government next argues that its obligation in a case of attempted rescue by the Coast Guard is in no event greater than that of a private salvor and that accordingly its conduct should be measured by the legal standard of the so-called Good Samaritan doctrine, citing Frank v. United States, 250 F.2d 178 (3d Cir. 1957) and Petition of United States, 216 F.Supp. 775 (D.Ore. 1963). Under its interpretation of this doctrine the Government contends that the Coast Guard has no duty to provide a seaworthy vessel to answer a request for assistance, nor even to provide one with equipment in good working order, but that those unfortunate mariners who become in need of assistance must take as they find her whatever vessel the Coast Guard deigns to send to their assistance.

■ The Government closes its eyes to reality when it persists in considering the Coast Guard's rescue operations as the equivalent of the situation in which one private vessel goes to the aid of another. Today and for some years past, the United States Coast Guard has carried out a search and rescue operation on a grand scale, which it is authorized to do by statute, 14 U.S.C.A. § 88(a) (1), (b), and which it is directed to do by the National Search and Rescue Plan promulgated in March 1956 by the President's Air Coordinating Committee. See United States v. Gavagan, 280 F.2d 319, 322 (5th Cir. 1960). The nature and extent of these activities are widely publicized through the public relations offices of the Coast Guard and other participating branches of the military service. The availability, and the usual excellence, of the search and rescue service and the fact that many mariners have been saved over the years by heroic action of the Coast Guard, Navy and Air Force are such matters of common knowledge as to be a proper subject for judicial notice. As a result of the holding out of the availability of this search and rescue service and the extensive publicity which it has received over the years, mariners,

commercial fishermen, yachtsmen and pleasure boaters, indeed all those who go down to the sea in ships, have been induced to rely on this usually excellent search and rescue service rather than seek assistance from private sources. The instant case is but one example of this reliance. Disabled because rudderless, but in no immediate danger, the BARBARA AND GAIL, which merely needed a tow to land, turned to the Coast Guard for assistance rather than call upon a fellow fisherman. On the other side of the coin, those fishermen and mariners who, true to the tradition of seafarers would otherwise go to the aid of vessels in distress or in need of assistance, now rely on the Coast Guard to do so. For example, in the case of Trawler Frank C., Inc. v. United States, In Admiralty No. 63–65–C, D. Mass. Dec. 22, 1965, decided by this Court, even though four fishing vessels were fishing off a common float they called for Coast Guard help and let the Coast Guard take over both the firefighting on and the towing of the disabled fishing boat.

■ To paraphrase Indian Towing Co. (350 U.S. at p. 65, 76 S.Ct. 122), even assuming that the Coast Guard need not have undertaken the search and rescue service, once it exercised its discretion to operate a search and rescue organization and engendered reliance on the competent assistance usually afforded by the vessels engaged therein, it was obligated to use due care to make certain that the vessels were kept in good working order; and, if the vessels were unfit for the job, then the Coast Guard was further obligated to use due care to discover this fact and to repair them or give warning that they were unfit. If the Coast Guard failed in its duty and damage was thereby caused to claimants, the United States is liable. I rule that the Coast Guard was under a legal duty to send out on this assistance mission a properly equipped vessel, manned by a competent crew, or else to inform the BARBARA AND GAIL that the Coast Guard did not have available a ship reasonably fit for the intended assistance mission or a captain and crew reasonably qualified to perform the assistance mission, and that the Coast Guard negligently breached these obligations.

■ I find that the Coast Guard assigned to this mission a vessel equipped with a defective loran, a defective gyro compass and repeater, a defective fathometer, and a totally inoperative radio direction finder. I find that McManus, who under the Coast Guard's chain of command was the officer responsible for deciding the vessel's capability of performing the mission, knew of all these defects and was negligent in not reporting to Coast Guard headquarters that the vessel was incapable of performing the mission due to this mass of defective gear and in nevertheless undertaking the mission; and that the BARBARA AND GAIL was never informed that the CG–95321 was navigating with all this defective equipment.

I find that McManus violated the Coast Guard's duty to use ordinary care in performing this mission by delaying unduly in reporting to First Coast Guard District headquarters that the hawser had parted, by electing to try to run the northerly route back to New Bedford instead of taking the slightly longer but much more shoal-free southern route, by relying on his defective equipment and assuming that he got accurate bearings therefrom, by telling Headquarters that he did not need relief, by failing to obtain the use of the loran and other navigational equipment on the BARBARA AND GAIL, by failing to identify Sankaty Head light as such, and by mistaking it for the Great Round Shoals buoy light. I rule that these negligent acts and omissions were proximate causes of the disaster which befell the crew of the BARBARA AND GAIL, including the loss of five lives.

■ The Government also contends that it is entitled to escape responsibility in this case because there has been no affirmative showing that the BARBARA AND GAIL was deprived of any available assistance from some other source because of misplaced reliance on the serv-

ices of the CG–95321, an allegedly essential element of a cause of action against the United States. I rule that claimants have no such burden of proof and that the Coast Guard is liable for damages caused by its negligence to any mariners who in fact have relied on the availability of its search and rescue services. When, as in the instant case, the Coast Guard has failed to use reasonable care in the course of attempting a rescue operation, it will not be heard to say that the unfortunate victims did not rely on the availability of its services.

■ On the other hand, if a showing is necessary that claimants forewent the services of other available rescuers, the record discloses that the BARBARA AND GAIL had a ship-to-shore radio telephone in good working order, that their call for assistance came from a position near Georges Bank, that at all material times they were on fishing grounds heavily used by the New England fishing fleet, and that Captain Kent has been a member of the New Bedford fishing fleet for some 33 years. On the basis of this record I find that by calling the Coast Guard for assistance the BARBARA AND GAIL passed up the opportunity to call for help from other fishermen in the general area of Georges Bank or from other members of the fishing fleet who were on shore and who certainly would respond to a distress call from a fellow fisherman. The Government's contention, which in effect is that on this record the Coast Guard was the sole rescuer available, is totally untenable, in view of the degree of commercial fishing and other shipping carried on daily off the New England coast and particularly in the area of Georges Bank and off Nantucket Island. It is clear that a call for private help at either 8:00 a.m. on December 18 or at any time before the CG–95321 reestablished the tow would have been early enough to assure the arrival of help in view of my findings as to the probable drift of the BARBARA AND GAIL and the evidence that sea anchors could have still further slowed down that rate of drift.

Finally, the Government argues that in any event the BARBARA AND GAIL suffered no so-called distinguishable injury, even assuming negligence on the part of the Coast Guard, because the Government claims that if left untowed the BARBARA AND GAIL would have fetched up on Rose and Crown shoals a few hours after the actual grounding because of prevailing winds and currents.

The Government relies on the testimony of Dean F. Bumpus, an oceanographer and an expert on the currents and tides of the Atlantic coastline. The argument is made that the parting of the towline occurred without the fault or negligence of the CG–95321, that had she not then taken the BARBARA AND GAIL back in tow the BARBARA AND GAIL certainly would have gone aground on the Nantucket shoals, that this is what in fact did occur, and therefore that the BARBARA AND GAIL sustained no distinguishable injury. I find, on the contrary, that the sinking of the BARBARA AND GAIL was an independent injury caused solely by the negligence of the Coast Guard. The finding that the towline parted due to the negligence of the crew of the CG–95321 undermines the cornerstone of the Government's argument, for, in view of that finding, the critical position of the BARBARA AND GAIL for purposes of applying the distinguishable injury rule is her position when the tow began. From that position, according to Mr. Bumpus, she would have drifted "out through South Channel clear of any shoals." Furthermore, the diagram prepared by Mr. Bumpus showing the course that he calculated the BARBARA AND GAIL would have followed if the CG–95321 had not reattached the towline (Govt. Ex. 78, superimposed on Govt. Ex. 57) was prepared on the false assumption that the BARBARA AND GAIL would have been drifting without any anchor dragging and for that reason is inaccurate. The BARBARA AND GAIL had three scallop dredges, or drags, on board, each weighing about 1100 or 1200 pounds. There were 200 fathoms of ⅞″ steel

cable on each drum of the winch. These dredges were often used as anchors while the BARBARA AND GAIL was fishing. A dredge would be attached to the line on the drum, thrown overboard and towed for a while until it filled up with rocks, and then was given some more line so that it served as an effective anchor. I find that Captain Kent would certainly have put a dredge overboard if he were adrift at the 2005 position and that the weight of the dredge would have had a substantial effect on the drift of the BARBARA AND GAIL. I therefore conclude that Govt. Exhibit 78 is based on inaccurate factual data and I am not persuaded that the BARBARA AND GAIL would have fetched up on the shoals if the Coast Guard had not reattached the towline.

Another vice in Govt. Exhibit 78 is the fact that it is based on weather testimony of the crew that is inconsistent with those conditions reported in the log. Earlier in this opinion the crew's testimony has been rejected as untruthful, and a finding has been made that the conditions reported in the log were the actual conditions. Mr. Bumpus prepared a diagram showing the drift of the BARBARA AND GAIL based on the weather data in the log of the CG–95321. According to that exhibit she would have arrived in the vicinity of the Great Round Shoals buoy 24 hours later. She thus would have drifted without grounding for the entire day of the 19th in an area heavily travelled by shipping.

Finally, Govt. Exhibit 78 and Roberts' Exhibit 32 are based on the assumption that the 2005 position is accurate. And this points up the key to this disaster. The evidence is overwhelming that McManus did not know where he was for most of the trip. I find that the 2005 position is inaccurate and for that reason Govt. Exhibit 78 is inaccurate.

■ I rule that this case involves a distinguishable injury caused by the negligence of the Coast Guard and that the governmental contention that no distinguishable injury is involved herein is totally devoid of factual foundation on this record, being predicated on the opinion of Mr. Bumpus which, in turn, is bottomed on a series of assumptions which in the course of this opinion I have ruled to be non-factual, and I find that the sole cause of the sinking of the BARBARA AND GAIL was the negligence of the Coast Guard.

■ As a corollary thereto, I rule that the Government's contention that this disaster was caused either in part or in whole by the contributory negligence of the captain and crew of the BARBARA AND GAIL is also without factual foundation. I find that during the course of the tow, those aboard the BARBARA AND GAIL relied on the navigational ability of the CG–95321 and that, though this reliance turned out to be misplaced, it was reasonable under the circumstances then prevailing. I likewise rule that there was no negligence on the part of the captain or crew of the BARBARA AND GAIL after her grounding and sinking.

■ In Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1942), the Supreme Court restated the principle which is to be applied in determining a petition for limitation or exoneration filed by a corporate shipowner, saying at p. 410, 63 S.Ct. at p. 293:

"In those cases it is held that liability may not be limited under the statute where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred."

In the instant case, Capt. John M. Waters, Jr., presently Chief, Search and Rescue Division, United States Coast Guard, Washington, D. C., who, on December 18, 1961, held the rank of Commander and was Staff Search and Rescue Officer, First Coast Guard District, testified that on December 18, 1961 nothing had been brought to the attention of the Boston Search and Rescue headquarters to give that headquarters any reason to believe that the CG–95321 was incapable of per-

forming search and rescue missions. Capt. Waters further testified that there was no Coast Guard regulation on December 18, 1961 which required the commanding officer of any Coast Guard vessel to furnish such information to Search and Rescue headquarters. He conceded, however, that subsequent to this tragedy such an order was promulgated. Captain Waters further testified that there was in effect "a general prudential rule" that regardless of a unit's status for patrol assignment, should a case arise which in the opinion of the commanding officer is beyond the unit's capabilities he shall immediately advise the Commander, First Coast Guard District. I find that as of December 18, 1961 the Coast Guard in effect had made the commanding officer of each vessel the sole judge of the capability of that vessel to perform an assigned mission.

The scope of the authority and responsibility of Lt. McManus, and the extent to which the Coast Guard vested in him complete responsibility for making decisions pertaining to this mission, are further established by the testimony of Capt. Waters as to the decision to cancel the sailing orders of the FREDERICK LEE, "The commanding officer on the seas is in the best position to know what his situation was * * * we felt he was in the best position to know what was happening there." Neither Waters nor anyone else at Search and Rescue headquarters exercised any independent judgment whatever in making this decision, but instead relied solely on McManus' judgment that he required no further assistance, despite the fact that they had available to them at that time weather information indicating that the CG–95321 was then operating in conditions which according to the guidelines set up by Search and Rescue (Govt. Ex. 2) indicated that it could not "operate at maximum efficiency * * * and its safety might even be jeopardized under such adverse sea conditions," and despite the fact that larger vessels were available. In view of the information available to him Waters was negligent in abdicating his responsibilities and rubber-stamping the decisions of the inexperienced immature McManus.

I rule that because of his position as Staff Search and Rescue Officer, First Coast Guard District, Waters was an "executive officer, manager or superintendent whose scope of authority included supervision over the phase of the business out of which the loss or injury occurred," and that his knowledge is chargeable to his principal, the United States. And I further rule that under the method of procedure and division of responsibility followed by the Coast Guard, McManus also was an "executive officer, manager or superintendent whose scope of authority included supervision over the phase of the (Coast Guard's) business out of which the loss or injury occurred," and, therefore, that the United States is not entitled to limitation of liability.

The petition for exoneration from or limitation of liability is denied and the case will stand for the assessment of damages.