Petition of the **UNITED STATES** of **America As Owner Of The UNITED STATES COAST GUARD VESSEL CG-95321, For Exoneration From Or Limitation Of Liability.**

**United States of America, Petitioner, Appellant.**

**David J. Grant, Administrator, Claimant, Appellant.**

**Nos. 7305, 7306.**

United States Court of Appeals
First Circuit.

Nov. 3, 1969.

---

William E. Gwatkin, III, Atty., Dept. of Justice, with whom William D. Ruckelshaus, Asst. Atty. Gen., Herbert F. Travers, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on brief, for United States, appellant in No. 7305 and appellee in No. 7306.

Harry Kisloff, Boston, Mass., with whom Morris D. Katz and George J. Dodd, Boston, Mass., were on brief, for Clarence Roberts et al., appellees in No. 7305.

John O. Parker and Ely, Bartlett, Brown & Proctor, Boston, Mass., on brief for the Sandra & Dennis Fishing Corp., appellee in No. 7305.

Harry Kisloff, Boston, Mass., for David J. Grant, Administrator, d/b/n, appellant in No. 7306.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

These are cross appeals from a judgment of the district court which adopted the master's report disposing of death and personal injury claims arising out of the sinking of the F/V BARBARA AND GAIL (B & G) on December 19,

1961.[1] The facts concerning the sinking are set out in our prior opinion in this case, United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189 (1st Cir.), cert. denied, 389 U.S. 836, 88 S.Ct. 52, 19 L.Ed.2d 98 (1967).

Two claims are involved here. The government appeals from the court's adoption of the master's award of $85,-314 to one Clarence Roberts, a member of the crew of the B & G, who was found to have sustained a severe chronic neurosis as a result of the accident. David Grant, the administrator of the estate of Calvin Roberts, a crew member of the B & G who drowned as a result of the accident, appeals from the denial of his claim on behalf of George Barter, the stepson of Calvin Roberts.

### The Roberts Claim

Clarence Roberts was on watch in the pilot house of the B & G when she was towed aground on the Rose and Crown Shoals by the CG–95321 about 1:30 a. m. on December 19, 1961. The B & G was stuck fast to the shoal for thirty to forty minutes and then capsized. Roberts testified that during this interval he was frightened and thought he would die. The ship then rolled to its starboard side, capsizing, and Roberts jumped from the port rail onto the bottom of the hull. There he clung for a moment until a breaker washed him into the sea.

Once in the water, Roberts tried to make his way to the CG–95321. However, the water was so cold that his arms and legs became numb and paralyzed and thereafter he simply drifted, supported by his life jacket. He testified that he was "very scared" and expected to drown.

The seas carried Roberts toward the Coast Guard boat and after some thirty minutes he drifted close to it. A line was thrown to him, but he was too cold to grasp it and a Coast Guardsman jumped into the water and tied another line to him. Roberts was hauled aboard and lost consciousness. When he awoke he found himself wrapped in blankets and his fellow crewmen were rubbing his arms and legs, which had turned blue. After returning to port he was treated by his family doctor for shock and immersion.

From the time of the accident Clarence Roberts was very depressed and emotionally upset. He perspired a great deal and wrung his hands constantly. He talked of suicide, experienced nightmares of the sinking, and complained of knots in his stomach. He was also troubled by pain in his shoulders and numbness in his feet. On the basis of expert psychiatric testimony, the master found that Roberts was:

> "suffering from a severe neurosis of an anxiety reaction type with depressive features, * * * that * * is chronic in nature and was caused by the circumstances of the sinking of the B & G and his subsequent immersion and near death at sea. [I find] further that Clarence Roberts' condition is permanent and prevents him and will continue to prevent him from working as a fisherman."

The master awarded $31,849 for lost earnings for the period 1962 through 1967; $51,396 for future earning loss; $1,870 for maintenance, medical expenses, loss of personal belongings and his share of the catch; and $10,000 for past and future pain and suffering, making a gross award of $95,115. Against this was set off a prior recovery of $9,-801 from the owners of the B & G, making a net award of $85,314.

On oral argument the government conceded the propriety of the $10,000 award

---

1. The liability aspects of this case have already been concluded. Petition of United States, 255 F.Supp. 737 (D.Mass. 1966); mod. sub nom., United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189 (1st Cir.), cert. denied, 389 U.S. 836, 88 S.Ct. 52, 19 L.Ed.2d 98

(1967). The government seeks to raise the issue of contributory negligence on the part of the B & G on this appeal. However, the court is of the view that they are precluded from doing so because that issue was determined in the prior appeal. 372 F.2d at 198.

for pain and suffering and it does not question the $1,870 item of miscellaneous damages. However, the government argues that the recovery for lost earnings due to Roberts' chronic neurosis is erroneous as a matter of law. Its position is that there is no right of recovery for emotional disturbance which is not the result of a substantial physical injury caused by the defendant's negligence. The claimant, on the other hand, contends that recovery is available irrespective of whether the emotional disturbance is causally related to a substantial, or indeed, to any physical injury. The question, as regards admiralty, appears to be one of first impression.

█ It has long been the rule that an action does not lie for negligently inflicted emotional disturbance alone. Southern Express Co. v. Byers, 240 U.S. 612, 36 S.Ct. 410, 60 L.Ed. 825 (1916); Leatherman v. Gateway Transportation Co., 331 F.2d 241 (7th Cir. 1964); Kaufman v. Western Union Telegraph Co., 224 F.2d 723 (5th Cir. 1955), cert. denied, 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956); Prosser, Torts § 55 (3d ed. 1964); Anno., 64 A.L.R.2d 100 (1959); see Western Union Telegraph Co. v. Speight, 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104 (1920); Chesapeake & Potomac Telephone Co. v. Clay, 90 U.S.App.D.C. 206, 194 F.2d 888 (1952); contra, Sahuc v. United States Fidelity & Guaranty Co., 320 F.2d 18 (5th Cir. 1963). However, it is almost uniformly recognized that recovery may be had for the physical consequences of mental disturbance, at least where there is some contemporaneous physical impact also resulting from defendant's negligence. Hopper v. United States, 244 F.Supp. 314 (D. Colo.1965) (no impact required); Strazza v. McKittrick, 146 Conn. 714, 156 A.2d 149 (1959) (no impact required); Robb v. Pennsylvania R. R. Co., 210 A.2d 709 (Del.1959) (no impact required); Herrick v. Evening Express Publishing Co., 120 Me. 138, 113 A. 16, 23 A.L.R. 358 (1921) (no impact required); Bowman v. Williams, 164 Md. 397, 165 A. 182 (1933) (no impact required); Spade v. Lynn & Boston Ry. Co., 168 Mass. 285, 47 N.E. 88, 38 L.R.A. 512 (1897) (impact required); Chiuchiolo v. New England Wholesale Tailors, 84 N.H. 329, 150 A. 540 (1930) (no impact required); Falzone v. Busch, 45 N.J. 559, 214 A.2d 12 (1965) (no impact required); Battalla v. State, 10 N.Y.2d 237, 219 N.Y.S. 2d 34, 176 N.E.2d 729 (1961) (no impact required); Bosley v. Andrews, 393 Pa. 161, 142 A.2d 263 (1958) (impact required); Simone v. Rhode Island Co., 28 R.I. 186, 66 A. 202, 9 L.R.A.,N.S., 740 (1907); Savard v. Cody Chevrolet, Inc., 126 Vt. 405, 234 A.2d 656 (1967) (no impact required); Prosser, Torts § 55, at 350–52 (3d ed. 1964); Restatement (Second) of Torts § 313(1) (1965); Anno., 64 A.L.R.2d supra, at 126–51 (1959). Moreover, the physical impact required by jurisdictions following the impact rule need not be either substantial or causally related to the mental disturbance. See, e. g., Conley v. United Drug Co., 218 Mass. 238, 105 N.E. 975, L.R.A.1915D 830 (1914) (fall due to fainting from fright); Driscoll v. Gaffey, 207 Mass. 102, 92 N.E. 1010 (1910) (fall to floor); Homans v. Boston Elev. Ry. Co., 180 Mass. 456, 62 N.E. 737, 57 L.R.A. 291 (1902) (slight blow); Porter v. Delaware, L. & W. R. R. Co., 73 N.J.L. 405, 63 A. 860 (1906) (dust in eye); Hess v. Philadelphia Transportation Co., 358 Pa. 144, 56 A.2d 89 (1948) (electric shock); Zelinsky v. Chimics, 196 Pa.Super. 312, 175 A.2d 351 (1961) (slight impact).

██ The grounding of the B & G resulted in a substantial jolt to Roberts and he was thrown into the water as the boat capsized. Both these impacts were caused by the negligence of the CG–95321 and were sufficient to satisfy the test applied by jurisdictions following the impact rule. Cf. Petition of Moore-McCormack Lines, Inc., 184 F.Supp. 585, 1962 A.M.C. 1111 (S.D.N.Y.1960), aff'd sub nom., Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 96 A.L.R. 2d 1085, 1962 A.M.C. 804 (2d Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962). We therefore

find it unnecessary to decide whether a contemporaneous physical impact should also be required as a prerequisite to recovery for the physical consequences of mental disturbance in admiralty. Hence, it remains only to consider whether Roberts' psychoneurosis is a "physical" consequence of the fright and mental disturbance occasioned by the grounding and sinking of the B & G.

The term "physical" is not used in its ordinary sense for purposes of applying the "physical consequences" rule. Rather, the word is used to indicate that the condition or illness for which recovery is sought must be one susceptible of objective determination. Hence, a definite nervous disorder is a "physical injury" sufficient to support an action for damages for negligence. Espinosa v. Beverly Hospital, 114 Cal.App.2d 232, 249 P.2d 843 (1953); Bowman v. Williams, *supra*; Savard v. Cody Chevrolet, Inc., *supra*.

The condition complained of by Roberts was established by the expert testimony of qualified psychiatrists. It is precisely the same as that compensated in *Savard*. Both are definite nervous disorders and we think that the requirements of the "physical consequences" rule are satisfied here.

This reasoning seems to have been at the root of the court's thinking in Petition of Moore-McCormack Lines, Inc., *supra*. Although the court did not deal explicitly with the question before us, it permitted recovery for virtually identical psychological injuries in very similar circumstances.

The McCORMACKITE went down off Cape Hatteras on October 7, 1954 with the loss of thirty-seven men. A number of survivors of the sinking were cast into the Atlantic without life boats and drifted, clinging to debris, for forty-six to fifty hours before being rescued. During this period a number were attacked and killed by sharks as some of their shipmates looked on in horror.

Subsequently, several of the survivors were awarded damages for, *inter alia*, permanent post-traumatic neuroses resulting from the sinking and their subsequent experiences in the water.[2] One, for example, was adrift for forty-nine and a quarter hours and fought off sharks before his rescue. The court found that:

"[e]ach time [he] went to sea after the sinking he suffered headaches and other bodily pains and became very nervous and tense; and fearful of the sea. * * * I observed him when he testified. He was nervous. He constantly wiped the palms of his hands which were perspiring. At the conclusion of his testimony he had tears in his eyes." 184 F.Supp. at 607, 1962 A.M.C. at 1120.

He was awarded damages for past and future lost earnings as well as for pain and suffering.

Roberts' claim is virtually identical to those in *Moore-McCormack*. Both he and the McCORMACKITE claimants suffer from chronic neuroses which prevent their working at sea as a result of tragic sinkings. We hold that definite nervous disorders which can be shown to be the result of immersions in sea catastrophes caused by defendants' negligence are compensable conditions.

The government conceded on oral argument that recovery from the date of the sinking to June 14, 1962 is proper if the court holds, as we do, that the claimant has a cause of action. However, it argues that Roberts had recovered from the neurosis caused by the sinking as of that date and is not entitled to damages thereafter. We find this contention to be without merit.

The government's position depends upon two bits of evidence. First, Dr. Landau, Roberts' psychiatrist, testified that on June 14, 1962 he told Roberts that he was well enough to return to work, although he could not go to sea. On June 20, Roberts went to sea on the F/V

---

2. The Rosario, DeJesus, DelValle, Sullivan, Hernandes and Williams claims.

DARTMOUTH and fished intermittently until October, 1962. He also made three trips in the late summer of 1963. This, the government claims, negates the finding of permanent disability.

Roberts testified, however, that each time he went out during those periods he experienced recurrences of the symptoms of his neurosis. He was extremely nervous, frightened, had knots in his stomach and sweated profusely. He finally "could not take it" and quit.

The government's second point is based on the testimony of its expert witness, Dr. Epstein, a psychiatrist. The doctor, who examined Roberts for the first time in 1968, stated, on the basis of the medical history, that Roberts appeared to have recovered from his condition about five years before. He added, however, that at the time of the examination Roberts was again suffering from a psychoneurotic disorder which was at least partially responsible for his inability to return to sea.

Given the testimony of the claimant's experts, to the effect that Roberts was permanently disabled as a fisherman by the chronic neurosis caused by the shipwreck and Roberts' own testimony as to his reactions upon returning to sea, we cannot say that the findings below are clearly erroneous.

*The Grant Claim*

George Barter is the son of the late Dora Grant, who was married to Calvin Roberts when he drowned in the accident. It is alleged that up to the time of the sinking, Roberts stood in loco parentis to George and that George was his step-son. The district court adopted the master's report which denied Grant's claim that George Barter was entitled to share in the recovery for Roberts' death, apparently on the ground that a step-child is not a "child or dependent relative" within the meaning of the Death on the High Seas Act[3] and consequently is not a permissible beneficiary. We think that decision was erroneous because Barter was a "dependent relative" of Calvin Roberts.[4]

Statutory language is to be given its natural and ordinary meaning absent a manifest legislative expression to the contrary. United States v. Cooper Corp., 312 U.S. 600, 605, 61 S.Ct. 742, 85 L.Ed. 1071 (1941). "Relative" is ordinarily understood to include persons connected with another by affinity as well as blood. Vernatter v. Allstate Insurance Co., 362 F.2d 403, 404–06 (4th Cir. 1966); Fidelity and Casualty Co. v. Jackson, 297 F.2d 230, 231–32 (4th Cir. 1961); Dexter v. Dexter, 283 Mass. 327, 329–30, 186 N.E. 782, 783

3. 46 U.S.C. § 761 provides: "Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

46 U.S.C. § 762 provides: "The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought."

4. The government argues that state law controls on this issue. We disagree. It is settled that Congress intended that "there be uniform construction [of the Act] without recourse to state law." Middleton v. Luckenbach S.S. Co., 70 F. 2d 326, 329 (2d Cir.), cert. denied, 293 U.S. 577, 55 S.Ct. 89, 79 L.Ed. 674 (1934); accord, In re Risdal & Anderson, Inc., 266 F.Supp. 157 (D.Mass. 1967); see also, letter from Justice Harrington Putnam of the Supreme Court of the State of New York to the House Comm. on the Judiciary reprinted in H.R. Rep. No. 674, 66th Cong., 2d Sess. 2 (1920).

(1937). Only in the rather specialized areas of the construction of wills, statutes affecting the distribution of property in intestacy, and auto insurance policies is the term read narrowly to include only consanguines.[5] *See, e. g.,* Fidelity and Casualty Co. v. Jackson, 194 F.Supp. 431 (E.D.N.C.), rev'd, 297 F.2d 230 (4th Cir. 1961) (insurance); Union Trust Co. v. Bingham, 273 Mass. 287, 173 N.E. 435 (1930) (anti-lapse statute); Indiana Lumbermens Mutual Insurance Co. v. Passalacqua, 30 Misc. 2d 626, 211 N.Y.S.2d 62 (Sup.Ct.1961) (auto insurance); *but see* Vernatter v. Allstate Insurance Co., *supra* (auto insurance). Here the policy of the statute does not call for such a restrictive reading of the term. A distinction between affines and consanguines would not be well-founded, since the Act is intended to benefit persons suffering pecuniary loss by reason of a death within its scope. Whether such a loss is suffered has nothing to do with whether the relationship is one of blood or of affinity. Hence, the term as used in the Act comprehends persons related to the decedent by affinity as well as by consanguinity.

 That Barter is a relative of Roberts by affinity is not subject to serious doubt. Affinity:

"[is] the connection existing in consequence of marriage between each of the married persons and the kindred of the other. It is distinguished from consanguinity, which denotes relationship by blood." In re Estate of Bordeaux, 37 Wash.2d 561, 565,

225 P.2d 433, 436, 26 A.L.R.2d 249, 253 (1950).

Step-children are, therefore, related to their step-parents by affinity. Depositors Trust Co. v. Johnson, 222 A.2d 49 (Me.1966); In re Estate of Bordeaux, *supra.* Since George Barter was Dora Roberts' natural son, her marriage to Calvin Roberts created a relationship of affinity, that of step-child—step-parent, between George and Calvin. Thus, George Barter was a "relative" of Roberts within the meaning of the Act.

 In determining whether Barter was dependent on Roberts at the time of the sinking we must look to the construction given the term in analogous statutes, as there are no decisions under this Act.

The Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–50 (1964), provides benefits for death and disability resulting from injury occurring on the navigable waters of the United States, provided workmen's compensation under state law is unavailable. 33 U.S.C. § 903. This statute complements the Death on the High Seas Act, the latter providing a remedy for death occurring more than one marine league from shore and the former dealing with cases arising on the navigable waters. The statutes are both intended to compensate persons for the pecuniary loss resulting from the death of one covered by the Act. Therefore the construction given a term under one is instructive as to how it should be read under the other.

5. The policies involved in construction of the term in those circumstances explain the exceptions to the rule. In decedent's estate cases the objective is to distribute the property in accordance with the testator's intent or the presumed intent of the intestate. It is hardly to be expected that the decedent intended affines to take to the exclusion of blood relatives. Dexter v. Dexter, 283 Mass. at 330, 186 N.E. at 783. The auto insurance cases defining the term narrowly involve the construction of "nonowned automobile" clauses excepting the insured from coverage while driving cars owned by relatives. Here the policies rarely define "relative" clearly and the term has been construed to mean "consanguines" under the rule that ambiguous terms in a contract are to be construed against the draftsman. The narrow reading enlarges the scope of the insurer's liability. *See, e. g.,* Fidelity and Casualty Co. v. Jackson, 194 F.Supp. 431 (E.D.N.C.), rev'd, 297 F.2d 230 (4th Cir. 1961); Indiana Lumbermens Mut. Ins. Co. v. Passalacqua, 30 Misc.2d 626, 211 N.Y.S.2d 62 (Sup.Ct.1961).

Among the possible beneficiaries under the Longshoremen's and Harbor Workers' Act are step-children, acknowledged illegitimate children, adopted children, children to whom the deceased stood in loco parentis, brothers and sisters, and grandchildren, provided that a person within the foregoing classes was dependent on the decedent. 33 U.S.C. §§ 902(14), 908(a)–(d). Hence, we turn to the cases defining "dependent" under these sections for guidance.

The test adopted by cases under the Act is a pragmatic one, turning on the existence of a reliance for the means of support rather than on any legal obligation. In United States Fidelity & Casualty Co. v. Britton, 88 U.S.App.D.C., 293, 188 F.2d 674 (1951), the test was stated to be that "there must be a legal or voluntarily created status where the contributions are made for the purpose and have the result of maintaining or helping to maintain the dependent in his customary standard of living." 188 F.2d at 675; accord, Pollock-Stockton Shipbuilding Co. v. Brown, 185 F.2d 37 (7th Cir. 1950); Standard Dredging Corp. v. Henderson, 150 F.2d 78 (5th Cir. 1945); Globe Indemnity Co. v. Calbeck, 230 F.Supp. 14 (S.D.Tex.1960).

The government contends that the touchstone ought to be the existence of a legal obligation to support the claimant. Since George Barter was not adopted by Roberts and his natural father was not only alive, but under an order to provide support payments for George, it is argued that George was not a dependent of Roberts.

Such a line of reasoning fails to reflect the reality of the situation. George Barter had not lived with his natural father for several years. The support order had never been complied with. It is undisputed that Calvin Roberts supported Barter from 1955 until his death in 1961. To hold, as the court did in adopting the master's report, that Barter could not recover because he had not been legally adopted by Roberts would be to exalt form over substance. Congress cannot have intended such a result to occur under this broad, remedial statute. We therefore adopt the test of dependency stated by the Court in *Britton* and conclude that George Barter was dependent on Calvin Roberts at the time of the sinking. Since we also hold that Barter was a "relative" within the meaning of the Act, the district court erred in excluding Barter from participation in the recovery.

We come finally to the issue of damages. The government contends that Barter is entitled to no more than an allocation from the damages heretofore awarded to the estate of his mother because he returned to the home of his natural father after her death. We agree.

The measure of damages under the Act is the pecuniary loss suffered by the beneficiaries. 46 U.S.C. § 762. It is undisputed that the master allocated one hundred percent of Roberts' earning capacity for the period between the sinking and the death of Dora Roberts Grant in 1965. It follows that George Barter is entitled only to an allocation from the award to the estate of Dora Roberts Grant for that period, since the pecuniary loss suffered by the beneficiaries cannot exceed the total earning power of the decedent.

The claimant maintains, however, that Barter is entitled to an additional award for the loss of expected benefits from the time of the accident until he reaches his majority. This view rests on the premise that the pecuniary loss for which compensation is awarded is to be measured from the perspective at the time of the death, irrespective of intervening circumstances.

The intention of the Act is to compensate beneficiaries for losses actually suffered. Therefore, when changes occur in the circumstances of a beneficiary before judgment which permit more precise measurement of the loss suffered, the changes are considered in making an award. Thus, the death of a beneficiary limits the period for which an award can be made. The City of Rome, 48 F.2d

333, 341–42 (S.D.N.Y.1930); *see* Van Beeck v. Sabine Towing Co., 300 U.S. 342, 347–49, 57 S.Ct. 452, 81 L.Ed. 685 (1937). Barter returned to his natural father upon his mother's death. Had Roberts been alive, Barter's dependency would have terminated. His actual pecuniary loss likewise ended at that time. Hence, he is not entitled to any recovery beyond an allocation from the award made to his mother's estate.

The award to Roberts is affirmed. The Grant claim is remanded to the district court for proceedings consistent with this opinion.