UNITED STATES of America, Petitioner, Appellant,

v.

SANDRA & DENNIS FISHING CORP. et al., Claimants, Appellees.

No. 6772.

United States Court of Appeals First Circuit.

Heard Dec. 5, 1966.

Decided Jan. 26, 1967.

190

William E. Gwatkin, III, Atty., Dept.
of Justice, with whom J. William Doo-
little, Acting Asst. Atty. Gen., Paul F.
Markham, U. S. Atty., and Morton
Hollander, Atty., Dept. of Justice, were
on brief, for appellant.

Morris D. Katz, Boston, Mass., with
whom Harry Kisloff and George J. Dodd,

Boston, Mass., were on brief, for Eleanore T. McCarthy, Adm'x, and others, appellees.

John O. Parker, Boston, Mass., with whom Ely, Bartlett, Brown & Proctor, Boston, Mass., was on brief, for Sandra & Dennis Fishing Corp., appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

At 0750 on the morning[1] of December 18, 1961, the Coast Guard Rescue Coordination Center in Boston received a call from the fishing vessel Barbara and Gail (hereinafter B & G) giving a position about 52 miles southeasterly of the Great Round Shoal entrance to Nantucket Sound and stating that she had lost her rudder; that the weather was good, and that she was in no immediate danger, but that she wanted to be towed to her home port of New Bedford. The Center dispatched the Coast Guard patrol boat CG-95321 (hereinafter the 95) for the mission. Seventeen hours later the 95 had towed the B & G onto the Rose and Crown, an extensive shoal ten miles east of Nantucket, after experiencing unexpectedly heavy weather and a number of misfortunes. We use the benign word "misfortunes." To what extent they were faults were the principal factual issues in the case. The B & G and five members of her crew were lost. The government brought a petition for exoneration or for limitation, and for a declaration of fault on behalf of the B & G. After a seven-day trial the district court denied all three requests in an extensive opinion reported in Petition of United States Coast Guard Vessel CG-95321, D.C., 255 F.Supp. 737, and the government takes this interlocutory appeal. A number of questions of law are raised, but their application requires us to make first a detailed examination of the factual findings.

The 95 was 95 feet long, and drew 4 feet forward and 6 feet aft. Her cruising speed was 17 knots. She was equipped for towing. The B & G was an apparently conventional scalloper, 90 feet long and with a maximum draft of 10 feet. The 95 was under the command of Lt. (jg.) McManus; the B & G of S. S. Kent, the president and principal stockholder of her corporate owner, Sandra and Dennis Fishing Corp., a claimant herein. The other claimants are the members of the crew or their legal representatives. The officer in charge of the Center, who authorized the dispatch of the 95, and who was admittedly a managing officer in the limitation of liability sense, was Commander Waters.

The 95 temporarily stationed at Woods Hole, was the only immediately available Coast Guard vessel. She was on ready status, as against a larger and much slower vessel, the Frederick Lee, which was on six hours availability. At sea was the still larger Barataria, assigned to Texas Tower No. 2. The court did not criticize the Center for not ordering out the Lee or detaching the Barataria, and we believe quite correctly so. At the same time, because of her light draft, the 95 was not a heavy weather vessel, and if heavy weather had been expected there might have been more of a question as to the advisability of dispatching her. In point of fact the unexpected weather did not seriously impair her performance. The strand was occasioned not by the weather, but by the navigational procedures of her commanding officer.

Leaving Woods Hole at 0820 the 95 proceeded through the Sound and passed the Great Round Shoal lighted fairway buoy (hereinafter the GRS buoy) at 1124. Thereafter she encountered increasing winds and seas and twice reduced her speed. She picked up the B & G on her radar at 4 to 5 miles without difficulty and reached her at 1545. At 1600 the tow was under way and McManus radioed his loran position to the Center. He set a course back to the GRS buoy and proceeded thereon until 1800 when the towing hawser parted. The by-then-heavy seas and wind, plus the fact that

---

1. We will follow the Coast Guard 24-hour system of designating hours and minutes.

the line had parted at the 95's end and so had to be recovered from the B & G, created great difficulties in reestablishing the tow. At 2035, having become apprehensive that the connection could not be effected at all, McManus radioed for assistance. Commander Waters thereupon instructed the Frederick Lee to get ready and assigned her to the mission. He concluded, because of the weather conditions, that it would be preferable for the 95 to desist in her attempts to reestablish the tow. Kent, however, was apprehensive lest they drift down on some part of Nantucket Shoals, and upon his urging the hawser was finally passed. Just as Waters was about to send a message to desist he received word that the tow was proceeding satisfactorily, and that relief was no longer needed. Waters thereupon ordered Lee to discontinue.

Because of the strain upon the B & G's stem occasioned by the heavy weather Kent requested to be towed as slowly as possible and more to windward. They proceeded variously until 2300, when Kent agreed that they might resume their regular course. At this point McManus determined that the GRS buoy bore 292°. He estimated an allowance for current and drift and proceeded at 300°.[2] At midnight he instructed the crew in the pilot house that he was going below for an hour, by which time the GRS buoy should be on their port hand. He requested to be called as soon as the buoy was seen, and in any event, at 0100.

At about 0100 a double flashing light was observed some 40° off the port bow. Jenkins, who was in charge, used the radar and discovered a pip, or target, which appeared to be a buoy, and which the court found was "on the same general bearing as the light." Jenkins concluded that the light was the GRS buoy, whose characteristic was a short-long (double) flash. He accordingly called McManus. McManus looked at the double flash and believing, too, that it was the buoy, order-

ed the course changed to head directly for it. Some twenty minutes later white water, which indicated a shoal, was observed two boat-lengths ahead. McManus endeavored to take evasive action, but with the wind and seas behind him, was unsuccessful. The 95 was carried over the shoal, dragging the B & G after her. Because of her greater draft, the B & G struck, and remained fast.

At first no one knew where they were. McManus sent a call for help, giving a wrong location, but shortly determined that they were somewhere on the Rose and Crown, some 6 or 7 miles from the GRS buoy. The light which, because of conceded distortion, had appeared to have a double flash, and had led them onto the shoal, now appeared more clearly and was seen to be flashing only once instead of twice. Rather than a buoy, it was Sankaty Head Light, some 11 miles away. By a most unfortunate coincidence, the radar target on the same bearing, to which they had attributed the light, was the Rose and Crown unlighted buoy. (The radar showed the substance without the light; the eye showed the light without the substance.)

Meanwhile, from the B & G, which had lost her small boats, Kent informed McManus that if it became necessary to abandon ship he would have his men tied onto a line, to be buoyed by a keg, so that they could be picked up downwind. For reasons not clear to us Kent's men were still waiting for such instructions when the B & G was suddenly swept off the shoal and immediately sank. Kent and five men, though swimming free, were rescued, but five others were not seen.

■ In placing unlimited blame upon the government the court criticized the 95, her personnel, and Commander Waters in many particulars, making a number of findings unfavorable to the government. We list the major ones in the order of their first appearance. All of these, with one exception, the court

---

2. The court did not discuss the propriety of this allowance, but the record affords full data for checking, and indicates that it was reasonable.

held to be "negligent acts and omissions [that] were proximate causes of the disaster." For some, footnote comment will suffice; the rest we will deal with at greater length.

1. Radio direction finder inoperable.[3]

2. Fathometer seriously defective and hand lead not used.[4]

3. Gyro compass had 3° error, and magnetic compass not used.

4. Loran inaccurate and unreliable.

5. Towline parted because of negligence.[5]

6. The 2250 loran position was erroneous.

7. Wrong to cancel request for relief after B & G back in tow.[6]

8. Loran broke down at 2345; McManus negligently failed to ask B & G for loran position.

9. Negligent misidentification of light.[7]

3. The RDF went out Saturday afternoon, December 16. There is no evidence that this type of device, originated long before the advent of the loran, is of such accuracy that it would have been of any special value in this case had it been operable. We find no evidence of negligence, and nothing in the record to support the court's finding that lack of this equipment was a proximate cause of the strand. If, however, we are misled by claimants' failure to introduce evidence on this score, the discussions and conclusions, infra, with relation to the defective loran are equally applicable here.

4. The court's finding is well grounded. However, there are no subsidiary findings supporting the conclusion that failure to take soundings contributed to the loss, or any testimony on which such could be based. On the contrary, the claimants' evidence was to the effect that they kept watch on their own fathometer in order to be warned if the water shoaled below ten fathoms, and that it never did so until the point of the strand. While we confess that examination of the chart makes this testimony questionable, the court apparently accepted it, and claimants say in their brief, "There are gullies on Nantucket shoals so that the Barbara and Gail did not necessarily pass over less than ten fathoms." Under these circumstances we will not try to work out a basis of liability for which none of the parties contends. At the same time we might add that if it should have been found that the vessels passed through shoal water prior to the strand, we would have to conclude that Captain Kent's undertaking was, in fact, the B & G's minimum obligation of due care, and that failure to perform it was substantial contributory fault. See discussion of contributory negligence, infra.

5. The court did not find that the parting of the hawser was a proximate cause of the strand, but negligence in this respect is so serious a charge against the Coast Guard

that we will briefly deal with it. The court's conclusion, rejecting the opinion of a government expert that the break was due to an inherent defect in the rope, was based upon a finding that the hawser was so fastened that the chafing gear, a canvass parcelling, was not in contact with the taffrail, with consequent wearing of the fibre. We believe that photographs introduced by the claimants, and stipulated to be of the broken line, conclusively demonstrate that the court resolved the testimony erroneously, and that the break occurred not off, but near the center of the parcelling. On this basis the finding of negligence is unsupported. We do not criticize the district court for this. Even on appeal counsel failed to point out the significance of the photographs, which show, however, that the parcelling had extended over both sides of the break.

6. The court does not explain the basis for this finding. At the time that McManus cancelled the request, the 95 had the B & G in tow, and was proceeding satisfactorily. Kent not only had requested that the tow be reinstated, but had expressly approved the general direction and the speed they were making. The court said that it was regrettable that Waters cancelled the relief, but it did not find, and it could not be suggested, that the vessels should have stayed where they were and marked time for the ten or so hours it would have taken the Lee to reach them. On the basis of the tow continuing it could not have made any difference whether the relief was cancelled or not; the strand would have occurred long before contact could have been achieved.

7. The government makes a very persuasive argument, based on the fact that Sankaty Head light in mist with an easterly wind sometimes appeared from a distance as having a double flash rather than a single one, as Kent himself admitted, and on the further fact that there were no true double-flashing lights anywhere in the

10. Negligent failure to check identification of light.[8]

11. Coast Guard negligent in sending out improperly equipped vessel, or

12. in failing to inform B & G that the 95 was improperly equipped and improperly manned.[9]

13. Negligent delay in notifying the Center that hawser had parted.[10]

area except the GRS buoy, that the court erred in finding the misidentification to have been negligent. We agree with the government that the court put too much faith in the testimony of Captain Kent in his deposition as distinguished from his prior testimony at the Coast Guard hearing. On the later occasion, obviously recognizing the difficulty he had caused himself earlier, Kent repeatedly introduced qualifications that, in our opinion, were totally contradictory to what he had said previously. In his original statement Kent testified that "atmospheric conditions at times changed the looks of the light so at times *one light looks the same as the other light* * * * the similarity in appearance has been—I've come in and out of there so many times that it's just when I see one, *even though they both look the same*, why they look different to me, so that's how I distinguish them now." (Ital. suppl.) Certainly, this "difference" could not be more clearly indicated as a "feel," appreciable only by one having particular experience. Yet in his subsequent deposition Kent testified that while Sankaty Head light appeared to flash twice, "the flashing was so much bigger * * * one light was brighter than the other light." The court accepted this new testimony and found that Sankaty Head appeared "substantially different" from a buoy. We prefer Kent's first testimony, not only because it is less suspect, but because we regard his explanation as physically implausible. The visibility of a light to the human eye must depend upon the luminosity that reaches the point of the observer. It seems to us obvious that as to any two lights, irrespective of their initial brightness, the luminosity at the utmost distance of visibility, or threshold, to the human eye must be the same. If it were brighter, it would have been seen sooner, *i. e.*, further away. We must reject Kent's attempt to explain away his previous statement.

8. We need not pursue this matter, nor the companion question of whether in the original identification McManus was negligent. We may say, in all fairness to McManus, that it is difficult for us to believe, even operating a Monday morning slide rule, see Page v. United States, E.D.La., 1952, 105 F.Supp. 99, 102, that where the 95 was looking for a buoy with two flashes in an area where nothing else was supposed to show two flashes, and found a buoy and a corresponding double flashing light in the area in which they were expecting to see one, it was negligent not to put a stop watch on the buoy and find it was flashing somewhat less frequently than it should have been. No one testified, and none of the extensive printed material introduced in evidence indicated that it is customary to clock buoys. We think that the Coast Guard's asking Kent whether he did so (and receiving a negative answer) was not an admission that it should have been done, but, if anything, the reverse. However, even if it could be thought that McManus was imprudent with respect to his conclusion that the light was the GRS buoy, negligence in this regard is irrelevant. Or, rather, lack of negligence in this regard would not make any difference in the result. If the loran positioning, as the court properly found, was wrong and negligently arrived at, any mistaken identification of the light was but a consequence of McManus' negligence in not having previously discovered that he was substantially off course. Accordingly, that prior negligence remained an active, producing cause of the strand.

9. There is at least a suggestion in the court's opinion that the 95 was improperly manned. We find no specific findings with respect to the crew, except as to the chafing gear. We believe this criticism, if made, was misplaced. See also fn. 5, supra. As to McManus, the fact that the court quite correctly found that he made an error did not mean that from the Coast Guard's standpoint, at least prior to this accident, he was unqualified to command. A detailed inspection report of the previous summer was reservedly commendatory of his ability. The matter of improper equipment we consider elsewhere.

10. When the towing hawser first parted there was no expectation that contact could not be reestablished. We do not think that McManus was required to report his difficulties until their seriousness became apparent. Furthermore, causation is totally lacking. If McManus had requested relief at the momment of the break, his relief was the Frederick Lee,

14. Negligent in taking route north of Nantucket.[11]

15. Negligent in relying on defective equipment.

16. Waters was negligent in accepting McManus' recommendation to cancel relief after the B & G was back in tow.

■■ The findings not disposed of in the footnotes fall into three categories, deficiencies in equipment, deficiencies in navigation, and acts and omissions to be considered on the issue of limitation. Before discussing these findings, however, we first consider the extent of the obligation that the Coast Guard owed the claimants. We think it clear that the applicable statutes, 46 U.S.C. §§ 741–752, 781–790, do not amount to a general undertaking by the United States to provide rescue service on demand. See Lacey v. United States, D.Mass., 1951, 98 F.Supp. 219. The case of Indian Towing Co., Inc. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, upon which claimants place principal reliance, did not impose liability upon the government because the Coast Guard maintained insufficient equipment—there navigational aids—per se, but because it failed to maintain a particular aid after the plaintiff had been led to believe it could rely on it. How much equipment the Coast Guard is to possess, and how much money it is to spend, measured, necessarily, by Congressional appropriations, must be for the government's uncontrolled discretion. We can recognize no obligation upon the government either to have had the 95 available, or to have had on board

any particular equipment. Frank v. United States, 3 Cir., 1957, 250 F.2d 178, cert. den. 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069; Petition of United States, D.Or., 1963, 216 F.Supp. 775, 781.

■ What we do recognize is precisely in accord with the principle laid down in *Indian Towing*, namely, that the government must not mislead, and must not induce reliance upon a belief that it is providing something which, in fact, it is not providing. We think the first ruling by the district court, that the Coast Guard "was obligated to use due care to make certain that the vessels were kept in good working order" was excessive, but that its alternative ruling, "or give warning that they were unfit", 255 F.Supp. at 749, was exactly correct. By its silence when it accepted the mission it must be found that the Coast Guard led the B & G to believe that the 95 was reasonably capable of performing the task.[12] This would include a representation that she was competently manned, or, to put it another way, the silence was an undertaking that the crew of the 95 would perform its functions with reasonable care.

Commander Waters testified, and, as will be developed, we find nothing to impeach or to contradict his opinion,[13] that an inaccurate gyro was of no consequence if the magnetic compass was correct. He further stated that "we have navigated many years without loran," and that the mission "could have been carried out with her loran out, in the conditions existing at the time this mission originated, which were moderate weather and good visi-

---

which could not have reached the scene in time to prevent the strand. See fn. 6, supra.

11. There was no testimony supporting this finding. In addition, although Kent denied that he knew McManus proposed to use the northern route, members of his crew contradicted him, and the facts themselves contradict him. Kent was an experienced navigator. He knew where he was, and he knew from his compass which way they were proceeding. Kent made several requests during the tow by his radio telephone, all of which McManus acceded to.

It is inconceivable that he did not know where they were going, and would not have complained if there had been any reason for taking a different route.

12. We emphasize that this was not a warranty in the sense that a "representation" of seaworthiness has been suggested to be made to a seaman.

13. It may be noted that such cross-examination as there was proceeded upon false assumptions that the magnetic as well as the gyro compass was out and that the radar was impaired.

bility." [14] The record conclusively shows that he was correct, and that the fault, and the eventual miscarriage, was due basically to human error and not to inadequate equipment.

So far as the gyro compass is concerned, it had been installed two months before. It had shown various errors from time to time, and was still officially "under evaluation." The court found that on December 18 it had a 3° westerly error. The government witnesses denied this, but the pertinent pages of the verification log in which any checking with the magnetic compass is recorded unaccountably disappeared before trial. We could not say that the court's disbelief of the government witnesses under all the circumstances was plainly wrong. We do say, however, that the claimants take nothing from the fact that the gyro was inaccurate. The sole fault, accepting the court's findings, was in the failure to maintain the customary verification with the magnetic.

We need not consider the gyro further, however, because it is overshadowed by the loran. A 3° steering error produces a deviation of only 5%. Had the loran been accurate, the 95 would have had a correct fix at 2250, and would thereafter have traveled off course, as a result of a 3° error, less than a mile. Had McManus checked with the B & G's loran at 2345, the departure would have been half a mile. We turn, therefore, to the subject of the loran.

It would serve no purpose to describe all the past troubles the 95 had had with her loran. Sometimes, in spite of repairs, the log showed, "not operating properly," sometimes, not operating at all. We assume that at other times its performance was satisfactory, although the log never so indicated. In all events, the log on October 17 showed "operation fair, and under evaluation." The only other entry prior to December 18 was on November 12, "No third function—inaccurate."

McManus testified that the third function was, in substance, a refined tuner essential to an acceptable result.

On December 18, according to his testimony, McManus took loran readings on the way out, which he found to be reliable. There is no written record of such, but it is clear that he took a reading at 1600 when the tow commenced. He took another at 1700, which he concluded was inaccurate. He testified that he explained this inaccuracy at the time by the fact that the motion of the vessel, due to the heavy weather, had interfered with his ability to operate the equipment. We believe that it should also have served to remind him of the loran's past history of unreliability. He took another reading at 2005, which he testified he accepted as accurate. At 2105, when the tow was recommenced, he reported a loran position to his base, but he conceded at the trial that this was a position simply worked out from his 2005 position. His final reading was at 2250. When he attempted another at 2345 the third function went out. McManus testified that he shut off the loran to cool, hoping that the third function would restore itself, and intending to check with the B & G's loran at 0100 if his had not come back. We can only regard this as a plan to lock the barn if it should be found that the horse had been stolen. By 0100, if they were on course, they would be close to the GRS buoy, with no need to check with anyone. If they were not by the buoy, they were already lost, in an area the Coast Pilot describes as "one of the most dangerous parts of the coast of the United States for the navigator."

The court described McManus' not checking with the B & G's loran immediately when his own went out as "incredibly irresponsible." The government's explanation that in hopefully waiting for his to cool McManus was comparable to someone "hanging up the telephone when the line is busy," seems to us a classic

---

14. He might have added that another condition was that the B & G was known to have an available loran. While we are not of the Mary Roberts Rinehart "Oh-if-she-had-only-known" school, it is clear that had McManus informed Kent of the condition of his own loran, the disaster would never have occurred.

example of excessive advocacy. In the light of its past history there could be no confidence that the loran would return to usefulness. More important, there was another "line" available for the asking.

The government says in one breath that those on board the 95 "had no reason to foresee the unforeseeable—that they were anywhere near Rose and Crown shoals—" and in another, in seeking to explain how they were off course, that this was an "area of unusual strong, variable and erratic currents." This description must have been well known to McManus for, again, it comes from the Coast Pilot. We may also add that, as he was well aware, it was dark, with a sea running and a strong wind. The court's finding of inexcusable neglect must be affirmed.

Of course if the 95 had not been, in fact, out of position, the failure to check would not have occasioned any harm. The court found, however, that the 2250 loran reading was substantially inaccurate because it was not reasonably possible that the 95 could have been where the loran indicated and have come out where she did. This conclusion seems almost inescapable. When he squared off for it at 2300 McManus calculated the GRS buoy to lie 18½ miles away, bearing 292°. At just under ten knots he predicted they should be "relatively close" by 0100. Instead, at that hour they picked up a radar target which was really the Rose and Crown unlighted can buoy. Their true position, which we will call PL, can be closely calculated by running a line from Sankaty Head through the the Rose and Crown can and continuing it the 3½ miles the radar indicated.[15] PL was not 18½ miles from McManus' assumed 2300 position, but only 13½. They had been running nearly two hours, at roughly ten knots and were some 5 miles short of where they should have been. Furthermore, although they were headed 300° to make good 292° or more, PL bore from the supposed 2300 position 275°, another very substantial error. In total, PL was some 6½ miles from the GRS buoy. Although government counsel emphasized currents, no witness testified that it was reasonable to find such a variance. But even should it be possible to be carried six miles in two hours, it is inconceivable that it could have happened in one. Had McManus requested a position from the B & G at 2345 the knowledge he would have received would have made the essential discovery.

In seeking exoneration the government makes much of the principle that a salvor who is a "good Samaritan" is not held to ordinary standards of care. See, e. g., The Henry Steers, Jr., E.D.N.Y., 1901, 110 F. 578. Compare The S. C. Schenk, 6 Cir., 1907, 158 F. 54. Whatever may be the limits of this principle with respect to volunteered salvage, we believe that if the Coast Guard accepts a mission it should conduct its share of the proceeding with acceptable seamanship. United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319, cert. den. 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365; see Biggs, J., dissenting, in P. Dougherty Co. v. United States, 3 Cir., 1953, 207 F.2d 626, 642–650, cert. den. 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068. We refuse to take the government's view, and be party to adding to the honored motto, "Semper Paratus," the words "Interdum Prudens."[16]

Before leaving this subject it may be asked whether the court's ultimate conclusion of liability is open to question where a number of its findings have been determined to be wanting. Cf. Carey v. C. A. B., 1 Cir., 1960, 275 F.2d 518, 522.

15. The 3½ mile figure is confirmed by the testimony of the time it took, from the change of course, to run onto the shoal.

16. "Always Ready," "Sometimes Careful."

The opinion of the majority of the court in P. Dougherty Co. v. United States, supra, that the possibility of a court determination of negligence would be destructive of Coast Guard morale seems to us misguided in principle as well as based upon a misconception of a court's ability to distinguish between true negligence and hard choices under pressure.

We agree with claimants, however, that the court's conclusions were not cumulative in the interdependent sense. It is sufficient that one substantially negligent action was a cause of the loss. We do not believe that any misconceptions which the court may have formed in any other matters entered into its findings regarding McManus' conduct with respect to the loran. We do not judge him for this on the basis of anything else that he may have done or may not have done. Nor do we judge him on any basis of res. ipsa loquitur such as appears to have been the ground of some of the cross-examination to which he was subjected—that the vessel was off course and therefore his navigation must have been faulty. We base liability upon established fault.

█ Finally, we are unimpressed, as was the district court, with the government's claim that it is not liable because the B & G, had the 95 not appeared at all, would have been lost in any event. The burden on this was on the government. Cf. Ladd v. United States, E.D.Va., 1951, 97 F.Supp. 80, aff'd, 4 Cir., 193 F.2d 929. We do not feel its unsuccessful attempt to establish this contention requires discussion.

█ The government asserts that the claimants were guilty of contributory negligence. This is by no means a fanciful contention. We do not agree with claimants that their only duty was to watch the towline and the behavior of their own vessel. Captain Kent was not a bargee, but an experienced mariner. The Coast Guard was not taking full charge; its undertaking was to "assist." We cannot accept claimants' argument that it was in full control because it had the "superior authority of a military branch of the government." While it is of course true that, ultimately, there had to be a "dominant mind," the claimants, at the least, had an obligation comparable to that placed upon passengers in an automobile to watch out for their own safety in those jurisdictions which impose such an affirmative duty. Cf. Chicago, R. I. & P. R. Co. v. Cox, 10 Cir., 1953, 208 F.2d 871. While we do not criticize Kent for going below and leaving a man on watch, it is obvious, in view of his acknowledged special experience, that had Kent's attention been called to the light by Roberts, the man on watch, the stranding would not have occurred. Kent testified that he instructed Roberts to let him know if he saw a light, but Roberts testified that his only instructions were to report if he saw anything unusual, and that he did not consider a light, which he took to be a buoy, unusual.[17] The court accepted Roberts' version. While it seems to us far more reasonable to believe Kent, particularly in view of the court's finding that Roberts could not be expected to recognize a buoy if he saw one, and, in any event, difficult to understand what Roberts expected to see within his instructions on a dark night other than a light, we cannot say that the court was plainly wrong. Nor can we quite say that Roberts' version of his instructions, and the interpretation which he gave them, fell short of the duty that was upon the B & G. The court's finding of no contributory negligence must be affirmed.

█ Turning to the question of limitation of liability under 46 U.S.C. § 183, the district court denied the government's petition on, essentially, two grounds. The first was because of the deficiencies of the vessel's equipment, as to which Commander Waters concededly stood in the position of an "executive officer," Coryell v. Phipps, 1943, 317 U.S. 406, 410, 63 S.Ct. 291, 87 L.Ed. 363, and had, in the court's opinion, at least presumed notice. Since we have held that these deficiencies were not in violation of any duty owed to the claimants, and were not themselves the cause of the loss, we have no occasion to consider the possibly difficult legal grounds, 46 U.S.C. §§ 183(e), (f), affecting his presumed knowledge. For us to

---

17. Roberts testified that Kent had instructed him to watch the fathometer for shoaling, but that no shoaling had occurred. See fn. 4, supra.

hold that the government was precluded from limiting liability because of deficiencies in equipment under such circumstances would be to impose upon the government the very obligation which we have held it did not undertake.

Alternatively, the impropriety of the conduct of McManus, as captain, in navigating the vessel, does not prevent limitation. It is against this very liability that the right to limit exists. La Bourgogne, 1908, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973; The George W. Pratt, 2 Cir., 1935, 76 F.2d 902. This could not be affected by the fact that Commander Waters accepted McManus' recommendation that the Frederick Lee's relief mission be cancelled. Apart from the fact that this cancellation, in our opinion, was not improper, see fn. 6, supra, Waters' "rubber-stamping" of McManus, to quote the court, did not promote McManus to a managing agent in other respects, or in some fashion charge Waters with McManus' subsequent, but totally unrelated navigational errors.

Very possibly the district court's refusal to limit liability was based upon its misconception as to the effect of the defective equipment. In all events, it was mistaken. The government, like a private owner, is entitled to the benefits of the limitation statutes. 46 U.S.C. § 746. When the nature of the fault or faults is examined, which we have done with close attention because of this ultimate question, we consider this a clear case. The Coast Guard supplied McManus with a vessel capable of performing the intended mission if properly operated, especially since the vessel to be assisted could furnish any needed loran position for the asking. The strand resulted from his lack of care and failure to exercise judgment. For this the government is liable; but it is likewise entitled to limit.

The decree of the District Court is affirmed in so far as it denies exoneration; the denial of limitation is set aside with instructions to enter a new decree granting limitation of liability.