Alida M. **DALEY,** Administratrix of the Estate of James H. Daley, Plaintiff,

v.

**UNITED STATES of America,**
Defendant,

and

Alida M. **DALEY,** Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. Nos. 76–2705–K(A), 76–2706–K(A).

United States District Court,
D. Massachusetts.

Oct. 6, 1980.

---

James Keane, Trial Counsel, Edward M. Swartz, Fredric A. Swartz, Boston, Mass., for plaintiff.

Richard D. Glovsky, Asst. U. S. Atty., Boston, Mass., Stephen E. Leach, Trial Counsel, Emmett B. Lewis, Trial Atty., Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

ALDRICH, Senior Circuit Judge.*

These are two actions against the United States under the Federal Torts Claims Act, 28 U.S.C. § 2674, and the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, alleging negligence on the part of the Coast Guard in delaying commencement, and in the ultimate conduct, of a search and rescue mission on the evening of Sunday, July 28, 1974 and the early morning hours of July 29, resulting in pain and suffering to plaintiff Alida Daley and pain and suffering and the wrongful death of her husband, James. By agreement the common issue of liability was tried first. Because what I regard as firmly settled principles prevent recovery on any view of the evidence, I resist the temptation to give a full account of the unfortunate capsize of the Daley boat and the circumstances leading to its discovery only too late to save Mr. Daley's life. There was, in fact, relatively little evidentiary dispute,[1] the principal disagreements being over the inferences to be drawn and the legal consequences.

For two previous summers the Daleys had owned, and used frequently for fishing, a 16 foot outboard motorboat. On the afternoon of July 28 they departed their base at Scituate Harbor to fish, together with two friends, Messrs. Myett and MacDonald. They did not say where they were to go (other than to children who left the scene), but in fact they went to the vicinity of Minots Light, 5 miles to the north. On arrival MacDonald threw over the anchor near the stern before they had stopped, causing the rode to become wound in the propeller. The occupants stood up, and in the excitement the boat swamped and then flipped over. Flares, flashlight and horn, as well as tools, were lost; only life preservers were saved. Attempts to right her failed, and the weight of the motor, which could not be removed without tools, kept the hull submerged except for about two feet at the bow. To keep from drifting, Mr. Daley managed to make fast to a lobsterpot buoy.

Although he wore a life preserver, MacDonald shortly succumbed, apparently to a heart attack. Some twenty boats passed by, fairly close, but none could be alerted, and darkness fell with Myett and the Daleys in the water, wearing life preservers and holding onto the hull. The sea was calm, and remained calm until many hours later, after the Coast Guard had come and left without finding them. Whether the air grew misty, I will deal with later.

When it became dark and they did not return, the Daleys' 18–year–old daughter, Rita, and later Mrs. Myett and many friends, gathered at the pier. Sometime after 9:00 P.M. Rita notified the Coast Guard. She described the boat and equipment; said her parents never stayed out after dark; that they were capable boat handlers; that there was no alcohol on board; that she did not know where they had gone, but that they had three favorite fishing spots, one off the gong buoy some distance out, a spot to the south, and north by Minots, and that they often went to

---

* Sitting by designation.

1. There was considerable disagreement as to the exact location of the capsize, but this is understandable, and irrelevant.

more than one. The Coast Guard instituted a PRECOM, which is an inquiry of all harbor masters, etc. in the area to learn if the boat might have landed or been heard of elsewhere. Especially on summer weekends this takes a long while, and is often never fully responded to. This one was no exception. When by midnight it was still incomplete and the Coast Guard had done nothing further, one of the Daley friends falsely stated that Mrs. Daley was pregnant, and when this produced no results falsely stated that they had been drinking and were inexperienced boaters. This did produce results. The Coast Guard manned its ready boat, the CG 41305, and commenced a search.

Pausing here, and assuming it were appropriate to review the reasonableness of the delay before starting the search, *see* post, I would say that if it was simply waiting for the completion of the PRECOM the Coast Guard waited overlong. A middle–aged man and wife, with two other men, who have told their families they would be back for supper are not going off on a toot, and if they had been compelled to land elsewhere they could be expected to have telephoned. Certainly well before midnight the high probability was that they were disabled at sea. The fact that most overdues eventually show up should not establish a rule of thumb.

■ It does not follow, however, that it was unreasonable not to search. I am not impressed by the Coast Guard's complaint based on the size of the possible area,[2] especially since the boat was known to have flares, but I am affected by the apparent lack of danger. The weather was good, the air warm, the sea calm, and presumably the trouble was merely motor–related, the battery, or lack of gas. Staying out all night could reasonably be expected to involve inconvenience and discomfort, but nothing more. This was the view of the Scituate assistant harbor master, who was on the scene, and I so find. I can well understand the unhappiness ashore, but I can understand, too, that the Coast Guard, whose Boston Headquarters receives a large number of overdue reports, did not believe it was exposing the boat's complement to danger.[3] If personal danger were the standard to be applied–in fact there is no reviewable standard, *see* post–I would find it was not unreasonable to suspect none.

When, at about 1:00 A.M., the Coast Guard was told, still before the PRECOM replies had all been received, that the Daleys were inexperienced and had been drinking, this put a different light on the picture, to which it immediately responded. I turn to whether the search itself was properly conducted.

■ At the request of the parties, I took a view of the Minots Light area on board the CG 41305. It gave me no insights into the terrain, beyond–indeed, less than–what was apparent on the chart.[4] On the morning in question the boat was manned by a crew of three of varying experience and capabilities. After searching elsewhere she arrived in the Minots Light area after Mr. Myett had already succumbed. She remained there for about three quarters of an hour, idling at about one knot, and using her searchlight without avail. Unhappily for the Daleys' peace of mind at one point she came with 100–200 yards of them, but did not see them or hear their cries. During this time, and longer, the assistant harbor master was searching inshore in a small outboard where, of course, he found nothing.

The CG 41305's complement testified that there was a haze or mist that reflected light

---

2. This is perhaps not entirely correct. If the sole problem were the subject's inconvenience, as distinguished from active danger, post, there might be a difference between a specific mission and a broadly unidentified search.

3. Its June–August 1974 figures show 234 overdues; only one capsize (this one), and one involving loss of life (this one).

4. It did give me some personal, non–record insights into the 41 footer. Except that the enclosed wheelhouse is manifestly poorer for listening, she is certainly an improvement over the old metal 40 footers. However, she is very noisy, especially the exhaust. But even were this a court's concern, there was no evidence that it was avoidable.

back and interfered with the effectiveness of their searchlight. Plaintiff denied this, and testified that the light was not lowered enough, but passed about three feet over them. I find the very fact that plaintiff thought she could see the course of the beam weakens her contradiction of the other witnesses as to the existence of mist. I accept the testimony of the Coast Guard witnesses of reflections and refractions and visibility difficulties. The crew was also handicapped by the fact that the Daley boat was almost totally submerged. Perfection would have required them to find her. In view of the mist I do not find they fell unreasonably short of perfection.

Plaintiff complains that the engines were not shut off and an audible search conducted. The Coast Guard witnesses respond that this was a large area and that in the Minots Light vicinity there was danger to the vessel and crew, because of the many rocks and ledges, in case the motors failed to start. I find this to be true. There were many rocks and ledges. An audible search in an uncertain area, to be effective, would require a great many stops, and a consequent drain on the batteries. I do not find it unreasonable *not* to have adopted it. Everything about the case, culminating in the circumstance that Mr. Daley perished just before they were discovered, soon after daylight, by a lobsterman when the Coast Guard was searching elsewhere, was extraordinarily unfortunate, but that is not the answer.

■ As I find the conduct of the search was within the bounds of reasonableness, I do not take space to pursue the Coast Guard's other activities of the night preparing for air and other survey when daylight would result in better visibility. I do not find it unreasonable to delay the air search until then.

Both parties say this is an important case, and I agree. It is certainly important to Mrs. Daley, who lost her husband, as well as his friends, in a night charged with emotion, frustration and pain. It is important for the Coast Guard not only in itself, but because it involves principles of wide application.

■ The first principle is not novel. There is no affirmative duty on the Coast Guard to institute a search even if a court would have considered its refusal unreasonable. *Frank v. United States*, 3 Cir., 1957, 250 F.2d 178, *cert. denied*, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069; *see United States v. Sandra & Dennis Fishing Corp.*, 1 Cir., 1967, 372 F.2d 189, 195, *cert. denied*, 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98. Congress, in its legislation and its appropriations, not the courts, sets the limits of the Coast Guard's obligations, short of some affirmative tort, and it has not set such a duty.

■ The second principle is that one undertaking does not necessarily require another. Plaintiff argues that the PRECOM is an "initial step in an SAR [Search and Rescue] mission [and that] [o]nce the Coast Guard undertakes a rescue mission it is under a duty to conduct that mission with reasonable care." This is a misconception as well as an overstatement. The purpose of the PRECOM is to assist in determining whether to do anything further. Absent some promise or affirmative representation, of which there was none here,[5] instituting a PRECOM commits the Coast Guard to nothing. Failure to follow it up is not comparable to abandoning a search that is already underway.

■ My first holding, accordingly, is that there can be no liability placed on the Coast Guard for its failure to start the active search earlier than it did, whether that be thought reasonable or unreasonable under the circumstances.

■ Next, there can be no liability as to the search itself simply because, if it were the fact, some of the crew on duty at the time were less than totally proficient in

---

**5.** On the contrary, plaintiff specifically complains that the Coast Guard represented there would be no search until the PRECOM was completed and that this would be in the indefinite future.

learning and experience, unless such deficiencies contributed in some way to the conduct of the actual search. The burden was on the plaintiff to show that the search was in fact negligently conducted, and I have found she failed to do so.

In light of the above I need not reach certain other questions, but in case of a possible appeal I will pass on them. To return to plaintiff's contention that undertaking a search obliges the Coast Guard to conduct it carefully, this is true if the Coast Guard thereby worsens the subject's position, as by causing affirmative injury. *E. g., Sandra and Dennis*, ante (negligence in towing disabled vessel onto shoal); *United States v. Lawter*, 5 Cir., 1955, 219 F.2d 559 (negligence in hoisting seaman without safety harness). Or there may be indirect harm, as by causing other searchers, or possible searchers, to "rest on their oars," *Lacey v. United States*, D.Mass., 1951, 98 F.Supp. 219, 220, in reliance on the Coast Guard's undertaking and its presumed, unless affirmatively disclaimed, competency. *E. g., United States v. DeVane*, 5 Cir., 1962, 306 F.2d 182; *see* Restatement (Second) of Torts, § 323. If, on the other hand, there were no such reliance, as here where no one else was available, a negligent failure to confer a benefit which more careful conduct would have achieved will not impose liability. *Frank v. United States*, ante.[6] Any other rule would change the entire operation of the Coast Guard, and would enlarge beyond measure the government's responsibility and financial exposure. *See Sandra and Dennis*, ante, 372 F.2d at 195; *Chute v. United States*, 1 Cir., 1979, 610 F.2d 7, 12, cert. denied, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789.

I add that it would be peculiarly inappropriate in the case at bar to impose a duty based simply on the commencement of a search which was instituted as a result of a

deliberate misrepresentation. A duty should rise no higher than its source, and it would be against public policy to permit the conning of a government agency into assuming liability.[7]

Finally, I do not pursue plaintiff's contention, controverted by the government, that the crew violated procedures contained in the National SAR manual and regional Coast Guard SAR plans. I do note that procedures outlined in an internal government manual do not define a standard of care owing to the public. *Thompson v. United States*, 9 Cir., 1979, 592 F.2d 1104, 1110 and cases cited; *Castillo v. United States*, 10 Cir., 1977, 552 F.2d 1385, 1389; *Home Shipping Co. v. United States*, D.Del., 1965, 239 F.Supp. 226, 231–32, aff'd, 3 Cir., 359 F.2d 435, cert. denied, 385 U.S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212; *cf. Clemente v. United States*, 1 Cir., 1977, 567 F.2d 1140, 1144–45, cert. denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (internal order of FAA regional office).

*The complaint is dismissed.*

---

**6.** While there is language in *Sandra and Dennis*, ante, that might suggest a broader rule, this was written in the light of the record, which showed that the disabled vessel, on the Coast Guard's acceptance of the tow, had refrained from seeking other available assistance. *See Petition of the United States*, D.Mass., 1966, 255 F.Supp. 737.

**7.** I express no opinion on the interesting hypothetical where a search was induced by misrepresentation and the search did worsen the subject's position. There could be many variations of such a question.