**Richard MILLER and Scott Hilliard, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 83–0037–P.**

United States District Court, D. Maine.

July 25, 1985.

Martin R. Johnson, Lang, Johnson, Huston & Boutin, Portland, Me., for plaintiffs.

Paula D. Silsby, Asst. U.S. Atty., Richard S. Cohen, U.S. Atty., Portland, Me., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW & OPINION

GENE CARTER, District Judge.

### I. FINDINGS OF FACT

#### A. *The Voyage of ENDURANCE*

Richard Miller and Scott Hilliard became friends while attending college together in the State of Washington. They both enjoyed sailing on the waters of Puget Sound. Miller had spent four years in the Navy on ships, but had no navigational experience, nor any experience in open ocean sailing. The younger Hilliard had taken a correspondence course in celestial navigation. In September of 1977, he crewed on a forty-one foot sailboat that made the crossing from Hawaii to the continental United States. At some time in 1979, the two young men resolved to sail a boat from the northeastern part of the United States southward, through the Panama Canal, then north again to their home in the northwest.

Hilliard and Miller worked for two years to save money for the voyage and, in February of 1981, they found the boat they

hoped would take them around North America. ENDURANCE was a thirty-three foot, wood-hulled yacht, built in Germany in 1926. ENDURANCE's prior owner was keeping her in the water at a marina in York Harbor when Hilliard and Miller first saw her in February of 1981. They paid $15,500 in cash for the boat. Miller and Hilliard spent the next six weeks making repairs and improvements to prepare ENDURANCE for their voyage. They set sail on March 30, 1981.

Early in their voyage, they discovered a leak in their fresh water tank. They stopped a fishing boat to replenish their fresh water supply and to ascertain their precise location. They had no modern navigational devices; Hilliard navigated by the heavenly bodies and dead reckoning. They exhausted their water supply on April 14, 1981, while anchored off Oracoke Island, North Carolina. Rather than making a landfall immediately to obtain water, however, they continued to sail in a southerly direction.

On April 15, sailing in ten- to twelve-foot seas blown up by a northeasterly wind, Hilliard and Miller lowered the sails on ENDURANCE and proceeded under "bare poles." They averaged about three knots with the wind pushing only the masts, rigging and hull surfaces of the vessel. At dusk, Miller attempted to signal a vessel in order to obtain water and a position fix. The boat still sailed under bare poles; her running lights were shut off. Miller flashed a spotlight intermittently at a passing vessel, which made no response. It became darker. The winds blew at about twenty-five knots and seas were six to eight feet. Miller sighted a second vessel and continued to signal. The vessel turned toward ENDURANCE, and Miller pulled out the empty water jugs and set them in the cockpit.

The following is Hilliard's and Miller's version of what happened when they made contact with the ship.

The ship set a motor whaleboat in the water, which motored over to ENDURANCE. An officer aboard the whaleboat asked, "What do you want?" Miller responded, "We would like water and a position fix." The officer then asked if anyone on board ENDURANCE needed medical attention and whether there were any mechanical difficulties. Miller responded in the negative to both questions. After speaking by radio to someone aboard the ship, the officer told Miller that he was to take ENDURANCE into tow. Neither Miller nor Hilliard made any response. One of the men on the whaleboat tossed a line to Hilliard at the bow of ENDURANCE. Hilliard fastened the line to ENDURANCE, leaving about ten feet of scope.

### B. *Aboard the GUADALCANAL*[1]

At approximately 6:45 p.m. on April 15, 1981, the U.S.S. GUADALCANAL, a 602-foot Navy amphibious landing vessel, steamed northeasterly at a speed of twelve knots approximately 24.5 miles off Cape Lookout, North Carolina. The weather was clear. The wind blew from the northeast at twenty-six knots, and seas had a combined height of about six feet. The junior officer of the deck, Lieutenant J/G Jeffrey Wayne Immel, spotted a high-intensity light at an unknown distance. The light drifted to starboard. Lieutenant Immel could see no navigation lights. The light shone directly at the GUADALCANAL, and Lieutenant Immel had a feeling that there was a problem. He informed the officer of the deck, Lieutenant Alan Hynes. The light became intermittent and less intense.

The signal bridge flashed a searchlight at the boat, and it appeared to respond. The signal bridge reported that the boat appeared to be trying to attract the attention of GUADALCANAL; it was identified as a small, two-masted sailboat. Lieutenant Hynes attempted to contact the sailboat by radio, but had no success.

1. This section sets forth the Navy's version of the events leading up to the failed rescue of the sailboat.

Captain T.J. Johnson, the commanding officer of the GUADALCANAL, was having dinner with Navy guests when he was informed by the navigator that the bridge watch team had detected an intermittent white light coming from a small boat. Captain Johnson went to the bridge to take a look for himself. Deciding that the small boat might be in distress, Captain Johnson ordered the ship be turned to starboard, in the direction of the small craft. The light was still visible intermittently, but at longer intervals.

As the GUADALCANAL approached the small craft, it illuminated the sailboat with signal lamps from the signal bridge. Captain Johnson saw two persons aboard the boat, one on the bow and one amidships. No sails were rigged, and no other means of propulsion was discernible. Captain Johnson determined at that time that the two individuals were in distress and had to be rescued.

Captain Johnson ordered one of the ship's two twent-six-foot motor whaleboats manned and dispatched to the sailboat. The whaleboat was set in the water under the command of Lieutenant Immel. Lieutenant Immel communicated with Captain Johnson by means of a hand-held "walkie-talkie" radio. Lieutenant Immel was under orders to go out to the sailboat and find out what was needed. As the whaleboat came within thirty feet of the sailboat, Lieutenant Immel asked, "Are you okay?" The response was, "Yes." Lieutenant Immel was directed to find out the names of the men on the sailboat, and he did so. He asked how many were aboard and where they were from. Lieutenant Immel directed the whaleboat to come around to the port side of the sailboat. The sailboat crew asked whether there were any fenders aboard the whaleboat to protect the hull of the sailboat from pounding against the whaleboat. There were none, but Lieutenant Immel directed his crew to use their hands to fend off the sailboat.

Lieutenant Immel then asked, "What can we do for you?" The reply Lieutenant Immel heard was that the crew of ENDUR-ANCE had been without food and water for three days. Lieutenant Immel reported this response to the Captain. One of the men aboard the sailboat then asked what their location was, and Lieutenant Immel obtained a position fix from the ship by radio. Lieutenant Immel asked if they had a light to help in maneuvering; he was told that the batteries aboard ENDURANCE had been exhausted from attempts to signal GUADALCANAL. Lieutenant Immel also recalls being told that ENDUR-ANCE's sails were damaged and could not be raised for repair due to the wind.

Upon hearing that the sailboat crew had been without food and water for three days and was uncertain of its location, Captain Johnson decided he was in a "life salvage" situation and that he had to rescue them. He believed the occupants of the sailboat were *in extremis*. He directed Lieutenant Immel to tow the yacht to the ship. He intended to take the crew off, secure the yacht to the ship, then call the Coast Guard to determine what to do next. He was aware that the wind was setting GUADAL-CANAL down on the sailboat.

### C. *The Rescue*

An unfortunate series of events followed. The recollections of the participants differ in some details, but there are no significant material discrepancies.

After taking the stern line from the whaleboat, Hilliard secured it to the bow of ENDURANCE. Within moments after the line was secured, as the stern of the whaleboat rose up on a swell, the short, taut line snapped off the bowsprit on ENDUR-ANCE. The whaleboat then proceeded into the lee created by the GUADALCANAL, towing ENDURANCE. From each side of the GUADALCANAL protrude aircraft elevators, which extend thirty-four feet from the hull of the ship, and catwalks. As the whaleboat approached the starboard side of the GUADALCANAL with the sailboat in tow, Hilliard and Lieutenant Immel realized that the yacht's forty-four-foot mainmast was in danger of striking the elevator. The whaleboat pulled away from the ship, but did so too late. The mainmast

struck the elevator, and the top six feet were snapped off.

After ENDURANCE was pulled clear of the elevator, Miller asked the crew of the whaleboat to tow ENDURANCE away from the ship, cut it adrift, and call the Coast Guard. He recalls making such a request two or three times, but it was "never heeded or responded to."

Captain Johnson then decided to make a second attempt to secure the sailboat to GUADALCANAL. He ordered that a line be passed down from the starboard elevator to the whaleboat so that ENDURANCE could be secured and its crew removed. Captain Johnson believed that the elevator was the only place on the GUADALCANAL to which a small craft could be secured.

On the second pass, the sailboat became lodged in the steel structure supporting the elevator. The elevator snapped off all but four feet of the mainmast. Hilliard quickly secured a line passed down from the elevator, leaped to a Jacob's ladder hanging down the side of GUADALCANAL and climbed aboard in order to try to talk to someone.

Meanwhile, the ship drifted down onto the yacht. As the ship rolled back and forth in the seas, the lower part of the elevator pounded the deck of ENDURANCE. Miller, still aboard ENDURANCE, lay flat in the cockpit to avoid being struck by the elevator. Water gushed from an "educator"[2] in the hull of the ship onto the deck of ENDURANCE, threatening to fill her with water. The sailboat then floated free of the elevator. The whaleboat approached ENDURANCE and took Miller aboard.

The whaleboat again approached ENDURANCE to fasten a line and attempt a third pass at GUADALCANAL. A crew member aboard the whaleboat attached a line to the base of what was remaining of the mainmast. They towed the sailboat away from the GUADALCANAL and around to the elevator. They attached the towline from the mast to a line dropped down from the elevator. The stub of the mainmast pulled free of its step, and it and all the boat's rigging, secured to ENDURANCE only by the stays, fell into the water alongside. The whaleboat, its crew, and Miller were then hoisted aboard GUADALCANAL. At some point during the second or third pass, ENDURANCE also lost her mizzenmast.

By this time, Captain Johnson had decided that using GUADALCANAL to tow ENDURANCE was not a good idea, but he was reluctant to leave the sailboat drifting in a heavily-trafficked sea-lane. With the line from GUADALCANAL still apparently secured to the stub of the mainmast, which was in turn secured to ENDURANCE by its fallen rigging, the crew of GUADALCANAL worked ENDURANCE around toward the stern of GUADALCANAL. The ship was started forward, and ENDURANCE was towed for about twenty-eight minutes before the tow was lost.

GUADALCANAL then turned about to find the sailboat and took her close aboard on the GUADALCANAL's port side. Captain Johnson's intention was to drop the port whaleboat to retrieve the sailboat. Before he had a chance to do so, the sailboat drifted under the fantail of GUADALCANAL, the ship came up, then down again, and crushed ENDURANCE. ENDURANCE splintered into small pieces and sunk immediately.

### D. The Legal Claims

Miller and Hilliard brought this action against the United States under 46 U.S.C. § 781 to recover damages for the loss of their boat and personal property. Plaintiffs allege that the Navy was negligent, first, in undertaking to rescue them when they neither asked for rescue nor needed it, and, second, by the manner in which the crew of GUADALCANAL attempted to bring ENDURANCE alongside GUADALCANAL and to secure her to the larger Navy vessel. The action was tried to the

2. The term used by the witnesses but more likely an "eductor."

Court, without jury, on June 10 and 11, 1985.

### E. *Disputed Facts*

■ Plaintiffs contend that the crew of GUADALCANAL never should have undertaken the rescue. They insist that they had been out of water for only one day and had ample food. Miller asked only for water, a navigational fix, and that a message be sent to their families.

Lieutenant Immel testified that he was told upon first contact with the sailboat that the crew had been out of food and water for three days. He relayed this message to Captain Johnson, who confirmed in his testimony that this was the message he received from the whaleboat. Any physical evidence of whether Miller and Hilliard had any food remaining has been lost at sea. The Court finds the testimony of Hilliard and Miller, however, to be credible. In a statement prepared just six days after the incident, before there was any indication that he was contemplating litigation, Hilliard wrote:

> My feelings after-the-fact? Hmmmmmmm ... We did signal for assistance. We were not disabled, in fact, we were making a good course for our destination. We did need water and a position fix is always helpful. We knew we were close to our destination but, not knowing the whims of the wind, thought it best to take on some water. I have not read any reports or news articles concerning the incident. That which I have gathered from others who have related such accounts speak of the ENDURANCE as "disabled" and that we had been without food, fuel and water for three days. *We had plenty of food and fuel and had been out of water for a day.*

(Emphasis added.) Defendant's Exhibit G. This statement, given just shortly after the incident, strongly corroborates the testimony of Hilliard and Miller. Their version is also supported by the fact that, when they encountered GUADALCANAL, their empty water bottles were in the cockpit of the boat. These are clearly visible in a photograph admitted as Plaintiffs' Exhibit 11. The photograph also demonstrates that the cockpit of the vessel is small; it is unlikely that its crew members would have cluttered it with several gallon jugs unless they intended to put them to imminent use. The presence of these jugs supports the Plaintiffs' testimony that they intended to obtain water and a navigational fix and to be on their way.

The Court finds, therefore, that neither Hilliard nor Miller ever stated that they had been out of food and water for three days. Lieutenant Immel obtained a mistaken understanding of the situation of ENDURANCE and her crew, and he relayed this incorrect information to Captain Johnson, who relied upon it.

■ It would be difficult to assign fault for this error in communications to one party or the other. It is not necessary to do so, however, in order to determine whether Captain Johnson acted reasonably in determining that Hilliard and Miller required rescue. Even assuming that Captain Johnson had known that Miller and Hilliard had food and had been out of water for only one day, under all the circumstances, he acted reasonably in determining that he should take them aboard GUADALCANAL.

It was Miller and Hilliard who first suggested that they were in distress by attempting to signal GUADALCANAL. They had no running lights on, a violation of international regulations. Their sails were down. As far as Captain Johnson could tell, they had no apparent means of propulsion. They had been out of water for a day, and they asked where they were located. When offered a tow, they did not refuse it. These circumstances, objectively viewed, would support a reasonable officer in believing that the sailboat was lost, without water, and perhaps, without any means of propulsion. Captain Johnson acted reasonably in the existing conditions of sea and wind when he determined that rescue of the crew was necessary.

## II. CONCLUSIONS OF LAW

### A. *The Applicable Law*

█ When the Coast Guard volunteers to render assistance to a distressed vessel, it may be held liable in an action for negligence if it fails to proceed with reasonable care and if that lack of care is the proximate cause of injury to persons or property. *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189 (1st Cir.1967); *Wellington Transportation Co. v. United States*, 481 F.2d 108, 110–11 (6th Cir. 1973); *see Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955). There is no suggestion here that the Navy should be held to any different standard of care than the Coast Guard. The United States argues, however, that negligence in the immediate course of a salvage service should not impose liability on the salvor unless the negligence is so glaring that it manifests a callous disregard for the lives or property being rescued.

█ The First Circuit expressly rejected this position in the case of *United States v. Sandra & Dennis Fishing Corp., supra.* The Court stated:

> In seeking exoneration, the government makes much of the principle that a salvor who is a "good Samaritan" is not held to ordinary standards of care. Whatever may be the limits of this principle with respect to volunteered salvage, we believe that if the Coast Guard accepts a mission it should conduct its share of the proceedings with acceptable seamanship. We refuse to take the government's view, and be party to adding to the honored motto, "Semper Paratus," [Always Ready] the words "Interdum Prudens" [Sometimes Careful].

372 F.2d at 197 (citations omitted). There being no principled ground to distinguish the Navy from the Coast Guard under these circumstances, and no suggestion that the Court should do so, it is clear that the Navy had a duty to undertake the rescue in this case with reasonable care.

█ The Court has found that Captain Johnson acted reasonably in determining that the crew of ENDURANCE required rescue. The next question to be determined is whether the crew of the GUADALCANAL exercised reasonable care with respect to the manner in which they undertook the rescue. There is near unanimity of opinion among witnesses for both parties that the decision to attempt to secure the small sailboat to the 602-foot Navy ship was ill-advised. James Soland, a licensed naval architect and marine engineer who testified as an expert for the Plaintiffs, testified that what the Navy did was "foolhardy to say the least." He noted that the GUADALCANAL, with the large surface area it presents to the wind, would drift considerably faster than would the much smaller ENDURANCE, and thus would be likely to drift down upon the ENDURANCE. He testified that the mere act of bringing the smaller boat alongside a ship of that size was likely to cause damage to the smaller boat and that the risk of damage was compounded by the presence of the elevator and catwalk overhanging the starboard side of the ship. He also testified that attempting to tow the sailboat with the rigging in the water was poor seamanship. The prudent course of action, Soland testified, would have been to remove the crew of ENDURANCE to the whaleboat and to have left the ENDURANCE adrift, to be salvaged by a more appropriate vessel.

Norman DeWeir, a second expert testifying for the Plaintiffs, agreed with Soland. He said, "I would never attempt to bring a small boat against an aircraft carrier."

Testifying for the United States, Captain Johnson forthrightly admitted that he would do things differently if he had another opportunity. He said he now would take the crew off the sailboat and would not attempt to tow it. He would leave the boat adrift, keep it in sight, and wait for the Coast Guard to arrive.

The Navy's own expert delivered the knockout blow to the Navy's claim that it acted prudently. Joseph Madeo, Jr., an

independent consultant with vast experience in marine salvage, testified that it was not prudent seamanship to bring the yacht alongside GUADALCANAL. He noted that the lives were rescued, but at a considerable risk, and that the property could have been saved by leaving the boat at sea.

All of this testimony clearly proves that it was imprudent to even attempt to bring the ENDURANCE alongside the GUADALCANAL. Although further errors in judgment were made, it is clear that this initial error in judgment, uncorrected even after repeated attempts failed, was a proximate cause of the damage and subsequent destruction of ENDURANCE.

That the decision to undertake a rescue was a reasonable one is no defense to this action for property damage. All expert testimony and facts adduced at trial prove that it was entirely unnecessary to attempt to secure ENDURANCE to the GUADALCANAL in order to save its crew. In fact, it was demonstrated at trial that the method employed by the Navy actually increased the risk of injury both to the crew of ENDURANCE and to the crew of the motor whaleboat. In this case, none of the considerations giving rise to the life rescue justified the conduct which damaged the sailboat.

### B. *Contributory Negligence*

 In actions under 46 U.S.C. § 781, fault is to be apportioned among the parties in proportion to the comparative degree of their fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). Plaintiffs had a duty to watch out for the safety of their vessel and themselves. *United States v. Sandra & Dennis Fishing Corp., supra*, 372 F.2d at 198; *MBL, Inc. v. United States of America*, Civil No. 78–52P (D.Me. July 28, 1981) (unpublished Opinion and Order of Timbers, S.J.).

 In this case, the Plaintiffs passively acquiesced in the first instance to the Navy's conduct. They had an opportunity to inquire as to what the Navy's plan was when it connected a towline to their boat. They testified that they assumed that they were going to be towed into the lee of GUADALCANAL in order to effect a water transfer. Even if this assumption is reasonable, still they made no protest when then were towed in close to GUADALCANAL. It was their duty, and it was in their interest, to look to the safety of their vessel. They should have attempted to suggest to the Navy that it was engaging in a procedure contrary to prudent seamanship. *See Basic Boats, Inc. v. United States*, 352 F.Supp. 44 (E.D.Va.1972); *MBL, Inc., supra*, at 14.

Miller testified, however, that after the top six feet of the mast were broken off during the first pass, he asked the crew of the whaleboat, "two or three times," to tow ENDURANCE clear of the ship, set it adrift and call the Coast Guard. He received no response. Hilliard testified that he heard Miller make such a request. Lieutenant Immel was not asked during direct or cross-examination whether he heard Miller's request. The Court finds that Miller did in fact ask that ENDURANCE be set adrift and thus made some attempt to watch out for the safety of his boat. The Plaintiffs did not, however, make any further protests to the Navy's actions, and they did not follow up to ensure that Miller's requests were heard. In addition, in a statement given six days after the incident, Hilliard admitted:

> From the very outset, both Dick and I knew better than to [tow] a rigged vessel alongside a ship, especially to windward. We should have refused the tow and offered a better suggestion.

Defendant's Exhibit G.

The Court concludes that the Plaintiffs were partially at fault for the loss of their vessel because they failed to protest the Navy's actions initially and made no further protest after Miller's requests to be set adrift were either unheeded or unheard. Plaintiffs missed several opportunities to cut short the misguided salvage attempt and thereby prevent the loss of their boat.

One method of apportioning fault in this case would be to attempt to itemize negli-

gent acts or failures to act of each party, assign a percentage of the causal fault to each act, then determine the total proportional fault of each party. Such an analysis, however, would be, to a certain degree, specious. The primary cause of the series of blunders that occurred was ignorance of the consequences of attempting to secure a small sailboat to a large ship in the open ocean under adverse weather conditions. This ignorance was shared by both parties. The Court finds the Navy's fault to be significantly greater, however, because, first, Miller did at one point attempt to stop the salvage attempt and, second, Miller and Hilliard had no opportunity to take part in the decision to attempt to secure the ENDURANCE to the GUADALCANAL that ultimately led to her sinking. Accordingly, the Court finds the causal fault of the Navy to be 75% and that of the Plaintiffs to be 25%.

### C. *Damages*

■ The measure of damages for the total loss of a vessel is fair market value, defined as "the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy." *Standard Oil Co. v. South Pacific Co.*, 268 U.S. 146, 155–56, 45 S.Ct. 465, 466–67, 69 L.Ed. 890 (1925). The best evidence of fair market value is the price obtained for similar vessels on the open market at the time of the loss. *Texas Co. v. R. O'Brien & Co.*, 242 F.2d 526–27 (1st Cir.1957). Courts not furnished with evidence of contemporaneous sales may rely upon the cost of the vessel to the owner, plus the cost of modifications—both costs depreciated. *See Greer v. United States*, 505 F.2d 90, 93 (5th Cir. 1974); *Texas Company v. R. O'Brien & Co.*, 242 F.2d 526, 527 (1st Cir.1957).

■ Plaintiffs paid fifteen thousand five hundred dollars ($15,500) for ENDURANCE. They testified that they spent six weeks working on the boat to prepare it for the voyage. As a matter of law, compensation for their labor may be a proper element of damages. *See Greer, supra*, 505 F.2d at 93. But they presented no specific evidence as to the amount, if any, that the value of the boat was increased by their work. Plaintiffs' counsel suggested that they should be compensated for their labor at the rate of seven dollars and fifty cents ($7.50) per hour. Plaintiffs offered no evidence as to the reasonableness of this figure, either as a going market rate for such labor or as properly reflecting the skill and efficiency of the Plaintiffs. At trial, Plaintiffs called Jeffrey Edwards, who was General Manager at York Harbor Marina at the time Plaintiffs worked on the boat at that marina. Plaintiffs elicited no testimony from him, however, as to the market rate for the labor they performed or as to the market value of improvements they made. The Court, therefore, does not have an adequate basis to award damages for the work performed by Plaintiffs. The Court finds the market value of the boat at the time of its sinking to be fifteen thousand five hundred dollars ($15,500).

Plaintiffs also lost the property they had stowed aboard ENDURANCE. Plaintiffs are entitled to recover the market value of the property they lost. *See Chevron Chemical Co. v. Streett Industries, Inc.*, 534 F.Supp. 801 (D.Mo.1982). Plaintiffs compiled a list of all items lost, and they alleged that the cost of replacing these items was seven thousand three hundred dollars and one cent ($7,300.01). Since most, if not all, of these items were of a used condition, this figure must be reduced by an amount reflecting the reduction in market value occasioned by their prior use. No such evidence of the present market value of these items was offered. The Court accordingly finds that Plaintiffs have failed to meet their burden of proving the market value of their personal property, and can recover nothing for its loss.

The damages in this case total fifteen thousand five hundred dollars ($15,500.00). Based on the foregoing, Plaintiffs are entitled to recover eleven thousand six hundred twenty-five dollars ($11,625.00).

Accordingly, it is ORDERED that judgment be entered in Plaintiffs' favor in the amount of eleven thousand six hundred twenty-five dollars ($11,625.00).

So ORDERED.